## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT FLECK ) | |
|  4455 Connecticut Ave. NW ) | |
|  Apartment 1117 ) | |
|  Washington, DC 20008 ) | |
| ) | |
|  *Plaintiff* ) | |
| ) | |
| *v.* ) | |
| ) | Civil Action No. 1:18-cv-1452 |
| DEPARTMENT OF VETERANS AFFAIRS ) | |
| OFFICE OF THE INSPECTOR GENERAL ) | |
|  810 Vermont Avenue, NW ) | |
|  Washington, DC 20420 ) | |
| ) | |
|  *Defendant.* ) | |

## COMPLAINT

### NATURE OF THE ACTION

1. Plaintiff Robert Fleck brings this action for damages under Privacy Act sections 5 U.S.C. § 552a(g)(1)(C) and (D), respectively, as a direct result of the United States Department of Veterans Affairs' Office of Inspector General's ("OIG") reckless and malicious investigation, and the publication of its inaccurate results.

2. OIG investigators began their investigation into Mr. Fleck having already decided that he had done something wrong. They then conducted the investigation to reinforce this conclusion, deliberately cherry-picking documents and testimony while failing to develop a full and accurate record. The OIG then disseminated its report, based on this purposefully incomplete and inaccurate record, internally throughout the Department of Veterans Affairs ("VA") and to the

public on the VA's website. (available at https://www.va.gov/oig/pubs/VAOIG-17-03324-123.pdf).

3.      In order to bolster its "findings" that Mr. Fleck committed acts involving conflicts of interest, nepotism, and false statements, the OIG referred Mr. Fleck to the United States Attorney's Office for the District of Columbia ("USAO") for criminal prosecution and then put pressure on the VA Office of General Counsel ("OGC") to fire Mr. Fleck. Fortunately, both the USAO and OGC saw through the OIG's flawed investigation and findings. But the damage was done. Mr. Fleck suffered an adverse employment effect, embarrassment, loss of reputation, economic and serious emotional harm. The damage continues every day that the vicious and inaccurate OIG report remains on the VA's website.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the matter pursuant to 5 U.S.C. § 552a(g)(l). This case presents federal questions pursuant to the Privacy Act, 5 U.S.C.§ 552a. Venue lies in this district under 5 U.S.C. § 552a(g)(5).

## PARTIES

5.      Robert Fleck, Plaintiff, is Chief Counsel of the Procurement Law Group in the Office of General Counsel at the VA. He resides at the address provided in the caption above.

6.      Defendant Office of Inspector General, is a component, organizational unit, bureau or office (collectively "component") of the United States Department of Veterans Affairs. Therefore, the VA created and, at all times material to this Action, controlled the records at issue here.

7.      The VA is an independent agency of the executive branch of the government of the

United States, within the meaning of 5 U.S.C. § 552a(a)(l). As a component of the VA, the OIG

may be sued in this Action in its own capacity.[1]

## FACTUAL ALLEGATIONS

**Background**

8.      Mr. Fleck has worked at the VA since May 1, 2016, when he was hired into the position

of Chief Counsel of the Procurement Law Group, a Senior Executive Service position. He is

currently at the tier two pay grade.

9.      Prior to being hired at the VA, Mr. Fleck worked at the United States Department of the

Army as an attorney from 2004 to 2016.

10.     During his tenure at Army and VA, up to the commencement of the OIG's investigation

in March 2017, Mr. Fleck had a spotless employment record. In 2013, while at the Army, Mr.

Fleck won an award for his leadership and legal advice known as the Meritorious Service Award.

11.     In addition to the Meritorious Service Award, Mr. Fleck also was presented with the

Superior Performance Award and Certificate of Achievement among other commendations

throughout his 12-year tenure with the Army.

12.     Mr. Fleck has been married to Kristina Wiercinski since 2006.

13.     Ms. Wiercinski is currently detailed as an appellate attorney for OGC's Court of Appeals

Law Group, a GS-14 position. Previously, she served as an e-discovery attorney for the OGC's

Real Property Law Group, also a GS-14 position. Ms. Wiercinski joined the VA on January 8,

2017.

---

[1] *Cloonan v. Holder, et al.*, 768 F. Supp. 2d 154, 161-62 (D.D.C. 2011) ("this Court has
previously held that naming components [of cabinet-level entities] as defendants under the
Privacy Act is appropriate since the statute's plain language is clear that an agency need not be a
cabinet-level agency such as the DOJ to be liable") (internal quotation and citations omitted).

14.     Mr. Fleck and Ms. Wiercinski had previously worked together at Army, where she served as a general attorney and contracts attorney advisor (GS-14), also winning a Superior Performance Award.

**Ms. Wiercinski Applies to the VA OGC**

15.     In or around the spring of 2016, during a weekly conference call, multiple senior counsel within OGC's acquisition groups identified as a problem the VA's struggles in meeting its e-discovery obligations.

16.     Upon information and belief, the senior counsel within the group resolved to address this problem by creating an e-discovery attorney position.

17.     Upon information and belief, during a conference call, OGC Procurement Law Group deputy counsel Vincent Buonocore recommended Ms. Wiercinski for the role to Deputy General Counsel Richard Hipolit, who was leading the call. Mr. Buonocore had previously supervised Ms. Wiercinski at Army and was very familiar with her work and qualifications.

18.     Mr. Fleck, who participated in this and other daily conference calls at the time with the groups, did not recommend, promote or otherwise discuss Ms. Wiercinski as a candidate for the position.

19.     After the call, Mr. Hipolit asked Mr. Fleck to send him Ms. Wiercinski's resume. Mr. Hipolit was Mr. Fleck's direct supervisor.

20.     Mr. Fleck forwarded Ms. Wiercinski's *curriculum vitae* at Mr. Hipolit's request on June 17, 2016.

21.     Ms. Wiercinski had six years of experience as an e-discovery attorney and twenty-four years of experience as an attorney.

22. Mr. Fleck recused himself from any discussions regarding hiring for the e-discovery attorney position once he learned that his wife's name was suggested as a candidate.

23. Despite Mr. Fleck's recusal, certain of his colleagues involved with hiring for the e-discovery attorney position continued to attempt to discuss the hiring process with Mr. Fleck, including making comments and jokes about Ms. Wiercinski. They would also copy him on e-mails about Ms. Wiercinski.

24. Mr. Fleck continued to remind his colleagues of his recusal and declined to discuss hiring for the e-discovery position or Ms. Wiercinski. He did not respond to any e-mails regarding either topic.

25. The position of e-discovery attorney for the Real Property Law Group was posted externally by OGC on August 12, 2016.

26. Ms. Wiercinski formally applied for the e-discovery position on August 18, 2016.

27. As was customary, a Best Qualified panel comprised of three OGC employees, all from the Real Property Law Group, was created to evaluate and choose among several applications for the position.

28. Mr. Fleck was not on the Best Qualified panel, did not select the members of the panel and did not communicate with its members regarding the e-discovery position. None of the members of the panel were supervised directly or indirectly by Mr. Fleck.

29. Upon information and belief, at least one member of the Best Qualified panel considered Ms. Wiercinski to be by far and away the best candidate. This panel member did not know that Ms. Wiercinski was Mr. Fleck's wife.

30. All three members of the Best Qualified panel rated Ms. Wiercinski as "Exceptional" in each of the three evaluation categories.

31.     The Real Property Law Group was and is one of three components of OGC's Contract Operations, along with the Procurement Law Group and the District Contracting National Practice Group.

32.     Mr. Fleck was not in the supervisory chain of the Real Property Law Group at any time during the announcement of the position, review of candidates, or selection of Ms. Wiercinski for the e-discovery position.

33.     Nor was Mr. Fleck in the supervisory chain of the Contract Litigation Team – made up of various OGC Contract Operations attorneys – at any time during the announcement of the position, review of candidates, or selection of Ms. Wiercinski for the e-discovery position.

**Ms. Wiercinski is Hired as an OGC e-Discovery Attorney**

34.     Around this same time, Ms. Wiercinski had also applied for and was in consideration for other openings within the VA's Information Law Group.

35.     The Best Qualified panel recommended to the Chief Counsel of the Real Property Law Group that Ms. Wiercinski be hired for the e-discovery position, as she was the most qualified candidate.

36.     Upon information and belief, given her qualifications and the desire to hire her before she accepted another position, the Chief Counsel of the Real Property Law Group informed Ms. Wiercinski by telephone in mid-September 2016 that she was selected for the e-discovery position.

37.     In response, Ms. Wiercinski indicated that she accepted the position.

38.     Informing a candidate of her selection for the position prior to an official offer letter is common in government hiring to ensure that the candidate will take the position before engaging in the bureaucratic work necessary to hire a federal employee.

39.    After she was told that she was hired, Ms. Wiercinski shared the news with Mr. Fleck.

40.    Consequently, on September 30, 2016, Mr. Fleck forwarded to Ms. Wiercinski an e-mail initially sent to him on May 5, 2016 listing the VA's e-discovery issues – helpful background information for Ms. Wiercinski as she prepared for her new role.

41.    The Best Qualified panel and the chief counsel of the Real Property Law Group officially selected Ms. Wiercinski for the position on October 4, 2016, and the decision was sent by the Selecting Official (chief counsel of the Real Property Law Group) to the Management, Planning and Analysis department immediately.

42.    Ms. Wiercinski received her official offer letter on October 5, 2016.

43.    Ms. Wiercinski began work as e-discovery attorney in the OGC's Real Property Law Group on January 8, 2017.

44.    She remained in that position until January 2018, when she was detailed to the OGC's Court of Appeals Law Group.

45.    Ms. Wiercinski has performed her job well, winning performance, bonus and time off awards.

**OIG Investigates Mr. Fleck**

46.    Upon information and belief, the OIG opened its investigation into Mr. Fleck in early-to-mid 2017.

47.    The OIG's investigation was conducted primarily by Administrative Investigator Jason James ("AI James"). AI James was assisted primarily by Administrative Investigator Leanne Shelly ("AI Shelly") and Attorney Advisory Cliff Stoddard ("AA Stoddard").

48.    Upon information and belief, the OIG reviewed documents and conducted at least eight interviews as part of its investigation.

49.     Upon information and belief, the investigative interviews took place between March and September 2017.

50.     Throughout the investigative interview process, AI James, AI Shelly and AA Stoddard sought only to support their predetermined conclusion that Mr. Fleck had a substantial conflict of interest in the hiring of Ms. Wiercinski.

51.     During their respective investigative interviews, four of Mr. Fleck's colleagues shared their recollections that Mr. Fleck had no participation or influence in the hiring of Ms. Wiercinski, and that Ms. Wiercinski was independently rated the best qualified candidate.

52.     These four witnesses spoke highly of Mr. Fleck's integrity, as well as their own as it related to the e-discovery attorney hiring process.

53.     Not satisfied with the positive or neutral accounts of Mr. Fleck's conduct, AI James, AI Shelly and AA Stoddard undertook questionable interview tactics to build their investigation against Mr. Fleck.

54.     On numerous occasions during their investigative interviews, AI James, AI Shelly and AA Stoddard purposefully showed witnesses documents that the witnesses had never seen before and requested that the witnesses speculate on what that document might mean.

55.     On numerous occasions during their investigative interviews, AI James, AI Shelly and AA Stoddard purposefully suggested to witnesses an interpretation of documents and events that painted Mr. Fleck in the worst possible light.

56.     On numerous occasions during their investigative interviews, AI James, AI Shelly and AA Stoddard purposefully shared their predetermined conclusion of Mr. Fleck's wrongdoing with witnesses and asked them to agree.

57.     During the interview of Mr. Fleck's supervisor, Mr. Hipolit, AI James and AI Shelly on multiple occasions attempted to persuade him that they had collected overwhelming and corroborated testimony about Mr. Fleck's misconduct. They did this despite only having conducted two prior investigative interviews, including one of Real Property Law Group Staff Attorney Benjamin Diliberto, who gave a positive account of Mr. Fleck and his conduct during the hiring process.

58.     Upon information and belief, Mr. Diliberto's investigative interview was so favorable to Mr. Fleck, and so unfavorable to the investigator's predetermined conclusion, that it was completely left out of the final OIG report.

59.     Nevertheless, AI James and AI Shelly insisted that they had overwhelming evidence of Mr. Fleck's misconduct to Mr. Hipolit, urging him to change his responses.

60.     In September 2017, AI James and AA Stoddard interviewed both Mr. Fleck and Ms. Wiercinski, each of whom provided thorough and truthful responses.

61.     Multiple interviewees noted to AI James, AI Shelly and AA Stoddard that Mr. Buonocore had initially recommended Ms. Wiercinski for the e-discovery position.

62.     Upon information and belief, AI James, AI Shelley and AA Stoddard never attempted to contact Mr. Buonocore as part of their investigation.

63.     Upon information and belief, the OIG investigation into Mr. Fleck concluded in early 2018.

**OIG Shares the "Findings" of its Investigation Within the VA**

64.     Upon information and belief, the OIG completed its investigative report in early 2018.

65.     Assistant Inspector General for Investigations Jeffery G. Hughes ("AIG Hughes") authored the report. Acknowledgements were given to AI James and AA Stoddard.

66.     Despite all credible testimony and many documents suggesting the contrary, the OIG concluded in its report that "Mr. Fleck had a conflict of interest and engaged in nepotism when he used his position as an [Senior Executive Service] manager . . . to advocate for the employment of his wife."

67.     Despite all credible testimony and many documents suggesting the contrary, the OIG found in its report that "Mr. Fleck shared VA sensitive information with his wife while she was being vetted for the VA position."

68.     In addition, because their testimony did not support the OIG's predetermined conclusion in this matter, the OIG concluded that Mr. Fleck and Ms. Wiercinski must have made false statements throughout their investigative interviews with AI James and AA Stoddard.

69.     The OIG investigative report's findings and conclusions were based on purposefully incomplete and inaccurate information.

70.     In drafting the report, the OIG omitted all of Mr. Diliberto's interview testimony and all other exculpatory evidence and statements favorable to Mr. Fleck.

71.     The OIG also completely omitted mention of Mr. Buonocore, who was involved in the initial decision to hire an e-discovery attorney and suggested Ms. Wiercinski's name. Multiple witnesses noted Mr. Buonocore's involvement.

72.     Multiple witnesses provided favorable or neutral interpretations of e-mails and documents. However, the OIG only included in its report the accounts that were most negative to Mr. Fleck.

73.     The OIG report also made five (5) recommendations concerning Mr. Fleck and Ms. Wiercinski. In summary:

a.      The VA Deputy Secretary, OGC and Human Resources should determine what administrative action to take against Mr. Fleck.

b.      The VA Deputy Secretary, OGC and Human Resources should determine what administrative action to take against Ms. Wiercinski.

c.      The VA Deputy Secretary, OGC and Human Resources should determine how much salary to claw back from Ms. Wiercinski.

d.      The VA Deputy Secretary, OGC and Human Resources should determine whether Ms. Wiercinski should remain at her current pay grade level.

e.      The VA Deputy Secretary and the VA Designated Agency Ethics Official ensure that Mr. Fleck's department receive appropriate ethics training.

74.     Upon information and belief, the OIG shared with the VA Deputy Secretary a copy of the investigative report, containing these recommendations, on or before February 9, 2018.

75.     On February 9, 2018, the VA Deputy Secretary sent a memorandum to the OIG indicating that the VA Deputy Secretary had reviewed the OIG report, concurred with its findings and was taking action in accordance with all five (5) recommendations.

76.     Upon information and belief, the OIG did not provide to the VA Deputy Secretary the underlying documents and interview transcripts used in creating its report.

77.     Upon information and belief, the OIG shared with OGC a copy of the investigative report regarding Mr. Fleck in early 2018.

78.     Upon information and belief, the OIG or VA Deputy Secretary relying solely on the OIG report, caused the OGC to commence administrative proceedings against Mr. Fleck.

79.     On March 23, 2018, the VA Deputy General Counsel of Legal Operations issued a proposal letter that cited Mr. Fleck on charges of conduct unbecoming and disclosing sensitive information and recommended his demotion to a non-supervisory position.

80.     Upon information and belief, the source of the allegations in the March 23 proposal letter was the OIG report and selected supporting documents.

81.     Mr. Fleck was provided these supporting documents. Unsurprisingly, the supporting documents were cherry picked by OIG to include only the most unfavorable documents and testimony from the investigation.

82.     Upon information and belief, the OIG had pressured the Deputy General Counsel of Legal Operations to issue a proposal letter recommending Mr. Fleck's termination.

83.     Mr. Fleck submitted a response to the proposal letter, along with exhibits, on April 9, 2018. Mr. Fleck's exhibits included statements from Mr. Diliberto and Mr. Buonocore, both of whom the OIG purposefully omitted or never interviewed prior to pushing for Mr. Fleck's punishment.

84.     On April 13, the General Counsel for the VA, James Byrne, issued an initial decision letter regarding Mr. Fleck. In it, he found that the charge of conduct unbecoming was unsupported but that Mr. Fleck technically did share sensitive information with Ms. Wiercinski before she officially joined the VA.

85.     General Counsel Byrne's initial decision recommended a letter of warning and additional training for Mr. Fleck.

86.     Upon information and belief, the OGC did not find the OIG's conclusion that Mr. Fleck made false statements during the investigation at all supported and did not bother to consider it for their proposal or initial decision letters.

87.     The OIG referred Mr. Fleck to the U.S. Attorney's Office on the conflict of interest and false statements allegations and referred Ms. Wiercinski on the false statement allegation. The USAO declined prosecution as to both.

88.     Upon information and belief, the OIG also shared a copy of the report with Human Resources, the Office of Accountability and Whistleblower Protection, and the Designated Agency Ethics Official in early 2018.

**OIG Publishes and Attempts to Bolster Its "Findings"**

89.     The OIG published its investigative report on its website on March 29, 2018. (available at https://www.va.gov/oig/pubs/VAOIG-17-03324-123.pdf).

90.     Upon information and belief, the published report was substantially similar, if not identical to the version circulated internally by OIG to OGC, Human Resources, Office of Accountability and Whistleblower Protection, Designated Agency Ethics Official, Deputy General Counsel of Legal Operations and the VA Deputy Secretary.

91.     The report, titled "Administrative Investigation of Conflict of Interest, Nepotism, and False Statements within the VA Office of General Counsel," made public the OIG's findings against Mr. Fleck, based on incomplete and incorrect supporting documents and testimony.

92.     The OIG report also appended the VA Deputy Secretary's February 9 letter to OIG indicating that he had accepted the OIG's recommendations and had begun to take action.

93.     The OIG report summary publicly disclosed that it had referred Mr. Fleck and Ms. Wiercinski to the USAO for prosecution. The OIG attempted to downplay the USAO's declination of prosecution by attributing the declination to, "in part, . . . available administrative remedies." The OIG did not indicate whether the USAO found any of the OIG's charges meritorious.

94.     The OIG report received much attention, resulting in articles about Mr. Fleck that quoted some of the most unfavorable language from the report.

95.     The OIG has not updated the report to reflect the OGC's findings that Mr. Fleck's conduct merited only a letter of warning and training, and not the demotion in rank that had been initially proposed.

**Resulting Harm to Mr. Fleck**

96.     As a result of the OIG report, Mr. Fleck's professional reputation and career prospects are irreparably damaged.

97.     Fearing that he had no future at the VA, Mr. Fleck applied for and received an interview for an attorney opening with another independent agency of the executive branch. His interview took place during the week following publication of the OIG report. Mr. Fleck was notified the day after this interview that he would no longer be considered for the attorney opening.

98.     Upon information and belief, many of Mr. Fleck's colleagues and subordinates are aware of the published OIG report, but are not aware of how incomplete and inaccurate the OIG's underlying investigation was, or that the OGC found much of the OIG's findings unsupported. As a result, Mr. Fleck's colleagues and subordinates have gossiped about him internally and, on occasion, exhibited disrespectful and insubordinate behavior towards him.

99.     Mr. Fleck has suffered emotional distress and embarrassment from the OIG report, which comes up at the top of searches for his name.

100.    Mr. Fleck has spent countless hours and substantial financial resources in fighting to clear his name and keep his job, all as a result of the OIG's purposefully malicious and inaccurate investigation.

## FIRST CAUSE OF ACTION
### (Violation of Privacy Act 5 U.S.C. § 552a(g)(1)(C))

101.    Mr. Fleck repeats and realleges the allegations contained in paragraphs 9 through 100 above, inclusive.

102.    Defendant OIG maintains records within one or more Privacy Act Systems of Records that pertain to Mr. Fleck.

103.    Defendant OIG failed to maintain records concerning Mr. Fleck "with such accuracy, relevance, timeliness, and completeness" as would have been necessary "to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to" Mr. Fleck that should have been "made on the basis of said record and consequently determinations were made which" were adverse to Mr. Fleck thereby violating 5 U.S.C. § 552a(e)(5).

104.    In failing to properly maintain said records, defendant OIG violated the provisions of 5 U.S.C. § 552a (g)(1)(C).

105.     Upon information and belief, the OIG continues to maintain records pertaining to Mr. Fleck in violation of 5 U.S.C. § 552a (g)(1)(C).

106.    As a result of defendant OIG actions, Mr. Fleck has been falsely accused of serious misconduct, accusations that were disseminated internally and externally, causing him serious harm.

107.    Defendant OIG, its employees and officers, to include one or more of AI James, AI Shelly, AA Stoddard and AIG Hughes, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

108.   Defendant OIG, its employees and officers, to include one or more of AI James, AI Shelly, AA Stoddard and AIG Hughes, acted intentionally or willfully in violation of Mr. Fleck's privacy rights.

109.   As a result of the actions of defendant OIG, Mr. Fleck has suffered adverse and harmful stigmatizing effects, including, but not limited to, an adverse employment determination, reputational harm in the federal government and legal community, lost or jeopardized present and future employment and/or financial opportunities and continued emotional trauma and embarrassment.

## SECOND CAUSE OF ACTION
### (Violation of Privacy Act 5 U.S.C. § 552a(g)(1)(D))

110.   Mr. Fleck repeats and realleges the allegations contained in paragraphs 9 through 100 above, inclusive.

111.   Defendant OIG maintains records within one or more Privacy Act Systems of Records that pertain to Mr. Fleck.

112.   Prior to its public dissemination of records pertaining to Mr. Fleck, defendant OIG failed to "make reasonable efforts to assure that such records [were] accurate, complete, timely, and relevant for agency purposes," thereby violating 5 U.S.C. § 552a(e)(6).

113.   In failing to make reasonable effort to assure the accuracy and completeness of Mr. Fleck's records prior to public dissemination, defendant OIG violated the provisions of 5 U.S.C. § 552a (g)(1)(D).

114.   Upon information and belief, defendant OIG, to include one or more of its employees AI James, AI Shelly, AA Stoddard and AIG Hughes, knew or should have known that its actions were improper, unlawful and/or in violation of the Privacy Act.

16

115.    Upon information and belief, defendant OIG, to include one or more of its employees AI

James, AI Shelly, AA Stoddard and AIG Hughes, acted intentionally and/or willfully in the

violation of Mr. Fleck's privacy rights.

116.    As a result of defendant OIG's actions, Mr. Fleck has been falsely accused of serious

misconduct, accusations that were disseminated publicly, causing him serious harm.

117.    As a result of the actions of defendant OIG, Mr. Fleck has suffered adverse and harmful

stigmatizing effects, including, but not limited to, an adverse employment determination,

reputational harm in the federal government and legal community, lost or jeopardized present

and future employment and/or financial opportunities and continued emotional trauma and

embarrassment.

## JURY DEMAND

Pursuant to the Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury in the

above-captioned action of all issues triable by jury.

## REQUESTED RELIEF

WHEREFORE, Mr. Fleck respectfully prays that this Court grant the following relief:

A.      award damages equal to actual and statutory damages sustained by Mr. Fleck under the

Privacy Act pursuant to § 552a(g)(4)(a);

B.      award Mr. Fleck compensatory and consequential damages as proven at trial;

C.      award Mr. Fleck punitive and exemplary damages as the Court may deem just and proper

to deter such future egregious conduct;

D.      order preliminary and permanent injunctive relief as appropriate to prevent further

violations of Mr. Fleck's rights under the Privacy Act;

E.      direct that all officers, employees, and agents of the United States who have violated the

Privacy Act with respect to this matter be referred for appropriate professional and/or

administrative discipline;

F.      award Mr. Fleck his costs and reasonable attorneys' fees incurred in this action as

provided by 5 U.S.C. § 552(a)(4)(E); and

G.      grant such other relief as the Court may deem just and proper.


Dated: June 20, 2018                                    Respectfully submitted,


                                                       /s/ Sara E Kropf
                                                       Sara E. Kropf (D.C. Bar No. 481501)
                                                       Law Office of Sara Kropf PLLC
                                                       701 8th Street, NW
                                                       Suite 300
                                                       Washington, DC 20001
                                                       (202) 627-6900
                                                       sara@kropf-law.com



United States Attorney's Office
555 4th Street, NW
Washington, DC 20530
202-252-7566