# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT M. FLECK,

                *Plaintiff*,

    v.

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF THE INSPECTOR GENERAL,

              *Defendant.*

Civil Action No. 18-1452 (RDM)

## MEMORANDUM OPINION AND ORDER

This Privacy Act case concerns the dissemination and publication of a report based on an investigation that Defendant, the Office of the Inspector General of the Department of Veterans Affairs ("VA OIG" or "OIG"), conducted into Plaintiff Robert Fleck's alleged involvement in his wife's selection for a position at the VA's Office of General Counsel, where Fleck also worked. Fleck alleges that Defendant violated two provisions of the Privacy Act—5 U.S.C. § 552a(e)(5) and (e)(6)—by maintaining and publishing inaccurate or incomplete information about him, which, in turn, prevented him from obtaining a higher paying job, caused him to incur legal fees to defend against the VA OIG's findings, and resulted in adverse effects on his health. After the Court denied Defendant's motion to dismiss on January 3, 2020, Dkt. 21, Fleck filed a second amended complaint, Dkt. 31, and the parties engaged in discovery, which concluded on March 1, 2021. Defendant now moves for summary judgment with respect to Fleck's claims,

Dkt. 49.[1]  For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part

Defendant's motion.

## I.  BACKGROUND

### A.    Factual Background

The following facts are taken from the parties' statements of material fact and responses

thereto.  *See* Dkt. 49-1 (Def. SUMF); Dkt. 53-1 at 1–6 (Pl. Resp. to Def. SUMF); Dkt. 53-1 at 6–

36 (Pl. SMF); Dkt. 56-1 at 6–36 (Pl. Sealed SMF); Dkt. 58-1 (Def. Resp. to Pl. SMF).  The Court

will summarize the relevant portions of the record and, where relevant, note the parties'

disagreements.  *See Seo v. Oh*, No. 18-785, 2021 WL 4318100, at *3 (D.D.C. Sept. 23, 2021).

Consistent with Federal Rule of Civil Procedure 56, the Court will view the evidence in the light

most favorable to Fleck, who is the nonmoving party, and will draw all reasonable inferences in

his favor.  *See* Fed. R. Civ. P. 56; *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

In May 2016, Plaintiff Robert Fleck left a twelve-year career working as a lawyer for the

Army to join the VA's Office of General Counsel ("VA OGC" or "OGC") as Chief Counsel of

the Procurement Law Group, a Senior Executive Service ("SES") position.  Dkt. 53-1 at 9 (Pl.

SMF ¶ 18).  The Procurement Law Group is one of three components of the OGC's Contract

Law Operations division, which also includes the Real Property Law Group and the District

Contracting National Practice Group.  *Id.*  In his capacity as Chief Counsel of the Procurement

---

[1] The VA OIG styles its motion as a "Motion to Dismiss Amended Complaint and, Alternatively, for Summary Judgment," Dkt. 49 at 1, but it does not clearly delineate which of its arguments support dismissal versus summary judgment.  In light of this ambiguity and because the resolution of Defendant's motion requires the Court to reach beyond the allegations in the complaint by examining the record created during discovery, the Court will resolve Defendant's motion according to the summary-judgment standard of Rule 56.  *See* Fed. R. Civ. P. 12(d).

Law Group, Fleck also served as a senior manager of the Contract Litigation Team.  Dkt. 58-1 at 8 (Def. Resp. to Pl. SMF ¶ 21).

Around the time Fleck joined OGC, the office had been experiencing significant e-discovery problems, Dkt. 53-1 at 9 (Pl. SMF ¶ 19), and, in April 2016, it had received approval to hire an attorney for a new e-discovery position, Dkt. 56-1 at 10 (Pl. Sealed SMF ¶ 21); Dkt. 58-1 at 8 (Def. Resp. to Pl. SMF ¶ 21).  A decision was eventually made to locate that e-discovery position within the Real Property Law Group.  Dkt. 56-1 at 10 (Pl. Sealed SMF ¶ 21).

In June 2016, the senior leadership of the OGC participated in a group call during which the e-discovery position was discussed.  Dkt. 53-1 at 11 (Pl. SMF ¶ 28).  This call included three SES-level employees—Fleck, Deputy General Counsel Richard Hipolit, and General Counsel Michael Hughes—and six other employees who, at the time, were GS-15 level or below: Cameron Gore, Charlma Quarles, Lisa House, Don Mobly, Barbara Stutuzer, and Vincent Buonocore.  *Id.* at 11 (Pl. SMF ¶ 30); Dkt. 58-1 at 11–12 (Def. Resp. to Pl. SMF ¶ 27).  The parties agree that on this call Fleck's wife, Kristina Wiercinski, who at the time worked as a lawyer for the Army, was discussed as a possible candidate for the e-discovery position.  *See* Dkt. 58-1 at 12 (Def. Resp. to Pl. SMF ¶ 31).  There is conflicting evidence in the record, however, regarding the extent to which Fleck contributed to that conversation.  One of the participants on the call, Vincent Buonocore, recalls that he first raised Wiercinski's name on the call because he had previously worked with her in the Army and knew that she had e-discovery experience.  Dkt. 53-1 at 13–14 (Pl. SMF ¶ 42); Dkt. 53-4 at 20 (Buonocore Decl. ¶ 3).  Buonocore does not remember Fleck "recommend[ing] Ms. Wiercinski for the e-discovery position" or "promot[ing] her candidacy in any other way."  Dkt. 53-4 at 20 (Buonocore Decl. ¶ 4).  Two other participants remember things differently.  Michael Hughes recalls Fleck

"mention[ing] that his wife [had] experience in that particular area" and "describ[ing] what her background and experience was." Dkt. 53-1 at 12 (Pl. SMF ¶ 33).  Richard Hipolit's memory is less clear.  "[T]he gist" of what he recalls "is [Fleck] saying that [his wife] would be . . . a qualified candidate," but he also cautions that he does not "remember exactly what [Fleck] said" and does not "remember [Fleck] saying that she would be a good candidate."  *Id.* (Pl. SMF ¶ 34). Instead, Hipolit says he was left with "the impression she would be a candidate."  *Id.*

For his part, Fleck told OIG investigators that when Buonocore suggested his wife would be a good candidate, he said "if that's the case, I'm not involved in it.  I don't want to be part of it.  I'm not in it."  Dkt. 53-3 at 151 (Fleck Tr. at 65).  Later, however, Fleck explained that "in hallway discussion[s] or [on] conference call[s]," "Cam Gore and Reid Nicolosi kept on asking" him about his wife's candidacy for the position.  *Id.* at 151–52 (Fleck Tr. at 65–66); *see* Dkt. 53-1 at 13–14 (Pl. SMF ¶ 36).  Fleck recalls that he "absolutely [did] not" recommend her for the position—calling that a "line" he would not cross—but did confirm that he told Gore and Nicolosi that "she did e-discovery" for "five years" and, "when asked, [he] would answer that she had the experience and could do the job."  Dkt. 53-3 at 152 (Fleck Tr. at 66–68); *see* Dkt. 53-1 at 13–14 (Pl. SMF ¶ 36).

On June 10, 2016, Hipolit sent Fleck an email that said: "Bob, this is a draft policy on salaries for new attorneys that I mentioned.  It is going to be circulated to the Chief Counsels for comment before it is finalized, but we could make a good case for our e-Discovery expert under these factors, we should be in good shape.  If you can get me a resume, we can think this through and move forward."  Dkt. 58-5 at 2 (Hipolit Tr. 29); Dkt. 58-1 at 17 (Def. Resp. to Pl. SMF ¶ 43).  In response, Fleck forwarded Wiercinski's résumé, along with the message "Resume as we discussed."  Dkt. 53-1 at 14 (Pl. SMF ¶ 43).

In the ensuing months, OGC set about designing the e-discovery position and planning the vacancy announcement. The parties dispute the extent to which Fleck was involved in that process. The email record from that period shows that Fleck was sent or copied on five emails from OGC employees regarding the position description. Dkt. 49-3 at 15–16 (OIG report). On Fleck's telling, he had no involvement in either designing the position or creating the position description, and while he acknowledges that he was included on emails about the position description, he notes that he did not send any emails back drafting or editing the description. Dkt. 53-1 at 10 (Pl. SMF ¶¶ 22, 25–26). OIG, in contrast, maintains that Fleck's involvement was more substantial. It points to statements by Cameron Gore, the official responsible for filling the new e-discovery position, who told OIG investigators that Fleck participated in conversations about the position description because he had experience with e-discovery matters. Dkt. 58-1 at 9–10 (Def. Resp. to Pl. SMF ¶¶ 22, 25–26); Dkt. 49-3 at 15–16 (OIG report). Specifically, Gore said that "Fleck had as much input as he did on the [position description] and that they were working together and collaborating on the e-Discovery [position description] as well as other [positions descriptions]." Dkt. 49-3 at 15 (OIG report).

OGC posted the e-discovery position on August 12, 2016, with applications due on August 19, 2016. Dkt. 53-1 at 14 (Pl. SMF ¶ 45). The announcement required external candidates to send their applications to Gore, who, as head of the Real Property Law Group, would be the selecting official for the position. *Id.* (Pl. SMF ¶ 48); Dkt. 58-1 at 19 (Def. Resp. to Pl. SMF ¶ 48). On August 16, 2016, Fleck forwarded the position description to Wiercinski, Dkt. 53-1 at 14 (Pl. SMF ¶ 46), who submitted her application to Gore on August 18, 2016, *id.* at 15 (Pl. SMF ¶ 50).

Three candidates applied for the position in total. *Id.* (Pl. SMF ¶ 51). Gore then assembled a "Best Qualified Panel" of three OGC employees—Katherine Smyth, Benjamin Diliberto, and Reid Nicolosi—to formally review the applications. *Id.* (Pl. SMF ¶ 52). The parties vigorously dispute what happened next. According to Fleck, sometime in "mid- to late-September," Gore telephoned Wiercinski and informally offered her the job, which she then accepted on the understanding that a formal offer would follow. *Id.* (Pl. SMF ¶ 53).

Defendant insists that no such call or informal offer ever occurred. On this score, it points to several pieces of evidence. First, Gore testified that he could not remember whether he made such a call, but added that he "did not have authority to let [Wiercinski] know . . . that she had the job" until the hiring "panel came back to [him]," which was in October. Dkt. 58-4 at 2–3 (Gore Tr. at 63–65, 67–68). Given the passage of time, however, he asked OIG to "check the phone records" to make sure. *Id.* at 3 (Gore Tr. at 66). OIG then asked Fleck and Wiercinski to provide any phone numbers that Gore might have called and then asked Gore for his VA office phone number, his VA cell phone number, and his personal cell phone number. Dkt. 49-3 at 19 (OIG report). OIG analyzed the telephone records associated with those numbers and found no evidence of a call taking place until after the hiring panel made its recommendation to Gore on October 4, 2016, although Wiercinski did receive several phone calls during that period from "unavailable" numbers. *Id.* at 19, 54; Dkt. 53-1 at 18 (Pl. SMF ¶ 65). According to OIG, the absence of any call from Gore was also consistent with the contemporaneous email record surrounding Wiercinski's hiring: Gore's emails show that, as late as October 3, 2016, he was still planning to hold interviews for the open position. Dkt. 49-3 at 29.

In any event, what is not disputed is that on September 30, 2016, Fleck sent Wiercinski an internal VA memo that catalogued various VA e-discovery "system failures" and contained

privileged attorney work product. Dkt. 53-1 at 15 (Pl. SMF ¶ 55); Dkt. 58-1 at 21 (Def. Resp. to Pl. SMF ¶ 55); Dkt. 56 at 19. Fleck and Wiercinski both maintain, however, that Fleck sent this information to Wiercinski only *after* Gore had informally given her the job in mid to late September, so that Wiercinski could "get up to speed" quickly because the VA's e-discovery had "major problems" and "stuff [was] hitting the fan." Dkt. 53-3 at 153 (Fleck Tr. at 99–100). As discussed, Defendant disputes that any such call ever occurred.

On October 4, 2016, Gore received the Best Qualified Panel's evaluation of the three candidates. Dkt. 53-1 at 16 (Pl. SMF ¶ 57). The panel rated Wiercinski "exceptional" in each areas of evaluation and deemed her to be the best qualified among the candidates. *Id.* at 16 (Pl. SMF ¶ 59); Dkt. 58-1 at 22 (Def. Resp. to Pl. SMF ¶ 59). An hour after Gore received the panel's recommendation, Gore emailed Human Resources to say that he was selecting Wiercinski for the position and that he would "like to notify her of my decision today, and that HR will be relaying the official offer to her shortly." Dkt. 49-3 at 33. Gore called Wiercinski to offer her the position, which she accepted. *See* Dkt. 58-1 at 25–26 (Def. Resp. to Pl. SMF ¶ 65).

Several months later, in 2017, the VA OIG's Administrative Investigations Division received an allegation that Fleck "actively and openly solicited, during a conference call with other [SES] employees that the VA [OGC] hire his wife." Dkt. 49-1 at 1 (Def. SUMF ¶ 1); Dkt. 53-1 at 1 (Pl. Resp. to Def. SUMF ¶ 1). That allegation triggered an OIG investigation into Wiercinski's hiring, which culminated in a report issued on March 29, 2018. Dkt. 49-1 at 2 (Def. SUMF ¶ 2); *see also* Dkt. 49-3 at 7–26 (OIG Report). That report detailed the process surrounding Wiercinski's hiring and made several findings, including the following:

- "Mr. Fleck, by recommending his wife for the position of e-Discovery Coordinator, advocated for his wife's employment." Dkt. 49-3 at 20 (OIG report).

- "Mr. Fleck . . . referred [his wife] to Mr. Gore, who ultimately hired [her], and who, at the time, was a GS-15 Deputy Chief Counsel." *Id.* (OIG report).

- "There is a direct connection between Mr. Fleck referring his wife to Mr. Gore, and Mr. Gore being influenced by that referral." *Id.* (OIG report).

- "Mr. Fleck, as the Chief Counsel in charge of bringing the Contract Litigation Team together, participated personally and substantially in a particular matter in which he and his spouse had a financial interest" by (1) "[b]eing involved in the conversation regarding the team having an e-Discovery Coordinator," (2) "[a]dvocating for his wife's employment as the e-Discovery Coordinator," (3) "[p]articipating in a discussion regarding pay," (4) "[p]articipating in announcing the position," and (5) "[s]ending his wife VA sensitive data regarding e-Discovery matters that were not available to other candidates." *Id.* (OIG report).

- "Mr. Fleck shared VA sensitive data with Ms. [Wiercinski] before she was selected." *Id.* at 21 (OIG report).

- "The investigation determined that Mr. Fleck and Ms. [Wiercinski] made false statements about when Ms. [Wiercinski] was selected for the e-Discovery position to lessen the potential consequences of Mr. Fleck having shared VA sensitive data with a non-VA employee." *Id.* (OIG report).

Ultimately, the report concluded that "Mr. Fleck engaged in nepotism and acts affecting his personal financial interest when he used his position to advocate for the employment of his wife and participated in establishing for her a GS-14 e-Discovery attorney position on a team that he would ultimately lead." *Id.* at 19–20. OIG attached as an appendix to its report a letter from the Deputy Secretary of the VA, Thomas Bowman, dated February 9, 2018, in which Bowman stated that he had "reviewed and concur[s] with the findings and recommendation in the OIG report." Dkt. 49-3 at 23.

During its investigation, OIG twice referred findings to the Department of Justice for possible criminal prosecution pursuant to its obligation under the Inspector General Act to report a matter to the Department of Justice any time "reasonable grounds" arise to believe that there has been a violation of federal criminal law. *See* Inspector General Act of 1978, Pub. L. No. 95-452, § 4(d), 92 Stat. 1101, 1103 (codified as amended at 5 U.S.C. app.). On August 30, 2017,

OIG presented allegations of nepotism and conflict of interest for a prosecution determination, Dkt. 56-1 at 46 (Def. Resp. to Pl. SMF ¶ 128), and on October 20, 2017, OIG submitted allegations of false statements to DOJ for a prosecution determination, *id.* at 47 (Def. Resp. to Pl. SMF ¶ 130). Both times, the Department of Justice declined to prosecute. *Id.* at 46, 47 (Def. Resp. to Pl. SMF ¶¶ 129, 131).

In October 2017, while OIG's investigation was wrapping up but before it issued its report, Fleck applied for the soon-to-be vacant position of Deputy General Counsel for Legal Operations. Dkt. 53-1 at 29 (Pl. SMF ¶ 132). On November 14, 2017, a Best Qualified Panel comprised of James Byrne (the General Counsel), Megan Flanz (the outgoing Deputy General Counsel for Legal Operations), and Michael Hogan (the Deputy General Counsel for General Law) interviewed Fleck for the vacancy. *Id.* (Pl. SMF ¶ 133); Dkt. 49-6 at 1 (Flanz Decl. ¶¶ 2–3); Dkt. 49-7 at 1 (Hogan Decl. ¶¶ 2–3). One to two days later, on either November 15 or 16, Byrne notified Fleck that he had not been selected for the position. Dkt. 49-9 at 43 (Fleck Dep. at 98). On November 17, 2017, Byrne announced that Cathy Mitrano—who at the time served as Chief Counsel of the VA OGC's Southeast District South—had been selected. Dkt. 56-1 at 29 (Pl. SMF ¶ 134); Dkt. 58-1 at 48–49 (Def. Resp. to Pl. SMF ¶ 135); *see also* Dkt. 49-6 at 2–3 (Flanz Decl. ¶¶ 4–9); Dkt. 49-7 at 2–3 (Hogan Decl. ¶¶ 4–9).

OIG completed its initial internal draft of the report on November 17, 2017, Dkt. 58-1 at 48 (Def. Resp. to Pl. SMF ¶ 134); Dkt. 73-1 at 8 (case log), and circulated a final draft and a copy of the materials cited therein to VA management for review and comment on January 10, 2018, Dkt. 58-1 at 48 (Resp. to Pl. SMF ¶ 134); Dkt. 53-3 at 287; Dkt. 73-1 at 8 (case log). OIG also sent a copy of the draft report and cited materials to OGC management. Dkt. 58-1 at 39–40, 48 (Def. Resp. to Pl. SMF ¶¶ 108, 134). Subsequently, Cathy Mitrano, the proposing official,

charged Fleck with "conduct [u]nbecoming" and "disclosure of sensitive information" in connection with the hiring of his wife and formally proposed that he receive a demotion from the SES level to the GS-15 level. *Id.* at 40 (Def. Resp. to Pl. SMF ¶ 108); Dkt. 73-5 at 2–6 (proposed demotion letter).

Fleck retained a lawyer to challenge the demotion. Dkt. 53-1 at 26 (Pl. SMF ¶ 110). With the assistance of counsel, he submitted a written response and attached two pieces of evidence. *Id.*; Dkt. 73-4 (response letter). The first was a declaration from Vincent Buonocore. Dkt. 53-4 at 20 (Buonocore Decl.). Buonocore attested that on the June 2016 call, he first raised Wiercinski's name as a possible candidate for the e-Discovery position because he had "supervised [her] when [they] were both attorneys for the army, and she had done an exceptional job handling e-discovery for some of the army's most complex cases." *Id.* (Buonocore Decl. ¶ 3). Buonocore further stated that he did "not remember Robert Fleck—on that phone call or at any other time—to have recommended Ms. Wiercinski for the e-discovery position at the VA or to have promoted her candidacy in any other way." *Id.* (Buonocore Decl. ¶ 4). Because OIG did not interview Buonocore, this account was not included in its final report.

Fleck also attached a sworn statement from Benjamin Diliberto, who was on the Best Qualified Panel that recommended Wiercinski's hiring and had been interviewed by OIG back in June 2017 as part of their investigation. Dkt. 58-1 at 41 (Def. Resp. to Pl. SUMF ¶ 112); Dkt. 53-4 at 136–37 (Diliberto Stmt.). In his statement, Diliberto took issue with two findings in the OIG report, which he said conflicted with his experience: first, that Fleck "helped establish for Ms. Wiercinski an e-Discovery attorney position" and, second, that Fleck "advocated for her employment." Dkt. 53-4 at 136 (Diliberto Stmt.). With respect to the first finding, Diliberto explained that "OIG's implication that [Fleck] w[as] responsible for the creation of the position

is utterly ridiculous" because "discussions about hiring a dedicated e-Discovery attorney" took place "[m]ore than a year before [Fleck] w[as] even hired at VA." *Id.* And with respect to OIG's second finding, Diliberto asserted that "[t]he implication that [Fleck] somehow influenced the determination of the Best Qualified Panel is absurd" because "[Diliberto] and [Fleck] never spoke about Ms. Wiercinski before she was hired;" Diliberto "had no idea who she was when [he] reviewed her resume;" and Wiercinski "was, by a wide margin, the most qualified applicant." *Id.* Although OIG had interviewed Diliberto, it did not include any of his testimony in its report, and it did not include Diliberto's interview transcript with the materials it sent along with the report to VA management. Dkt. 58-1 at 42 (Def. Resp. to Pl. SMF ¶¶ 114–15).

Fleck submitted his response to VA General Counsel Byrne, who was responsible for deciding whether Fleck would receive discipline. *Id.* at 40–41 (Def. Resp. to Pl. SMF ¶¶ 110–11). After reviewing Fleck's response and Buonocore's and Diliberto's statements, Byrne asked OIG for a transcript of the Diliberto interview and questioned why they had not interviewed Buonocore. *Id.* at 42 (Def. Resp. to Pl. SMF ¶¶ 114, 116). On April 13, 2018, Byrne decided not to demote Fleck and instead imposed written counseling as discipline for (what he characterized as) Fleck's "technical violation" of sharing sensitive information. *Id.* at 41 (Def. Resp. to Pl. SMF ¶¶ 111–12); Dkt. 73-6 (Byrne decision letter).

Deputy Secretary Bowman also reviewed the additional evidence that Fleck provided in his response. Dkt. 58-1 at 28 (Def. Resp. to Pl. SMF ¶ 76). On May 16, 2018, Bowman rescinded most of his concurrence with the OIG report. Dkt. 58-1 at 28 (Def. Resp. to Pl. SMF ¶ 76); Dkt. 73-3 at 1 (Bowman rescission letter). He explained that "[g]iven further evidence that has been presented on this matter that was not a part of the record provided to me . . . I disagree with all of the findings in the report, except for the finding on sharing sensitive

information." Dkt. 58-1 at 28 (Def. Resp. to Pl. SMF ¶ 76); Dkt. 73-3 at 1 (Bowman rescission letter). The letter was not publicly released, and OIG did not update the appendix of its report to replace Bowman's previous concurrence letter. Dkt. 58-1 at 28 (Def. Resp. to Pl. SMF ¶ 77); Dkt. 53-1 at 19 (Pl. SMF ¶ 77).

In addition to the proposed demotion, Fleck points to several adverse consequences that he claims resulted from the issuance of the OIG report. For instance, in late 2018, the Office of Accountability and Whistleblower Protection ("OAWP") opened an investigation into Fleck based on an allegation that Fleck had hired three former colleagues from the Department of the Army into VA positions. Dkt. 53-1 at 31 (Pl. SMF ¶ 147). Fleck retained counsel to represent him in the OAWP investigation. *Id.* (Pl. SMF ¶ 148).

In February 2018, before the OIG report was published, Fleck applied for a job at the Department of Defense. Dkt. 53-1 at 30 (Pl. SMF ¶ 138). The parties agree that Fleck was qualified for the role, and Fleck received an interview for the position, which took place on April 3, 2018. *Id.* (Pl. SMF ¶¶ 138–39); Dkt. 58-1 at 49 (Def. Resp. to Pl. SMF ¶ 138–39). OIG published its report four days before Fleck's interview; however, no one at the interview mentioned the report. *Id.* (Pl. SMF ¶ 142). The following day, one of Fleck's interviewers notified him that he had not received the position. *Id.* (Pl. SMF ¶ 143).

Fleck also applied to several private sector jobs in the defense industry throughout 2018. Dkt. 53-5 at 6 (Fleck Answer to Interrog. 2). The parties dispute whether these jobs paid more than Fleck's current job and whether Fleck was qualified for the vacancies. Dkt. 58-1 at 45 (Def. Resp. to Pl. SMF ¶¶ 124, 126). They agree, however, that Fleck did not receive interviews for any of these positions. *Id.*

Finally, Fleck asserts that, after the report was published, he suffered adverse effects on his health. Dkt. 53-1 at 31 (Pl. SMF ¶ 145). The parties dispute, however, whether Fleck's health problems, which predated the issuance of the report, were caused or exacerbated by the report's issuance. Dkt. 58-1 at 51–52 (Def. Resp. to Pl. SMF ¶¶ 145–46).

**B.    Procedural Background**

On June 20, 2018, Fleck filed a two-count complaint alleging claims under two provisions of the Privacy Act, 5 U.S.C. § 552a(g)(1)(C) and (D), Dkt. 1, which he amended on October 5, 2018. Dkt. 12. On November 15, 2018, Defendant filed a motion to dismiss the complaint, which the Court denied in a Memorandum Opinion and Order on January 3, 2020. Dkt. 21. Defendant then filed its answer, Dkt. 24, and moved for judgment on the pleadings, Dkt. 26. On February 19, 2022, the Court held an initial scheduling conference with the parties, at which it denied Defendant's motion for judgment on the pleadings and heard and granted an oral motion by Fleck to amend the complaint a second time. Min. Entry (Feb. 19, 2020). Fleck filed his second amended complaint on February 28, 2020. Dkt. 31. The parties then began a year-long period of discovery, which concluded on March 1, 2021. *See* Min. Entry (Feb. 19, 2020); Min. Order (Dec. 22, 2020). On June 14, 2021, Defendant moved to dismiss or, alternatively, for summary judgment. Dkt. 49. On August 6, 2021, Fleck opposed Defendant's motion, Dkt. 53, and moved to strike the affidavit of one of Defendant's witnesses for failure to comply with the expert-disclosure requirements of Rule 26(a)(2), Dkt. 52. Those motions are now before the Court.

## II. LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment

"bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the outcome of the litigation under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

## III.  ANALYSIS

The Privacy Act, 5 U.S.C. § 522a, "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records."

*Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996) (quotation marks omitted).  The Act authorizes four types of civil actions.  *See* 5 U.S.C. § 552a(g)(1); *Doe v. Chao*, 540 U.S. 614, 618–19 (2004).  Fleck invokes two of them.  First, he asserts a claim under Section 552a(g)(1)(C).  That provision creates a civil action against an agency if the agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination . . . that may be made on the basis of such [a] record," and that failure causes "a determination [to be] made which is adverse to the individual."  5 U.S.C. § 552a(g)(1)(C).

Second, Fleck invokes Section 552a(g)(1)(D).  That provision permits individuals to sue if the agency "fails to comply with any other provisions of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on [the] individual."  *Id.* § 552a(g)(1)(D).  As a predicate to his Section 552a(g)(1)(D) claim, Fleck says that Defendant violated two substantive provisions of the Privacy Act: Sections 552a(e)(5) and (6).

Section 552a(e)(5) is nearly identical to Section 552a(g)(1)(C).  It requires an agency that maintains a system of records to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination."  *Id.* § 552a(e)(5).  Section 552a(e)(6) adds somewhat different obligations.  It provides that

> [e]ach agency that maintains a system of records shall . . . prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes.

*Id.* § 552a(e)(6).  Subsection (b)(2), in turn, covers disclosures required under the Freedom of Information Act.  *Id.* § 552a(b)(2).

A plaintiff may recover damages under Section 552a(g)(1)(C) and (D) only if he proves that (1) the agency's violation of the Privacy Act proximately caused the adverse determination or adverse effect at issue, (2) the agency "acted in a manner [that] was intentional or willful," and (3) the plaintiff suffered "actual damages." *Id.* § 552a(g)(4); *Dickson v. Off. of Pers. Mgmt.*, 828 F.2d 32, 37 (D.C. Cir. 1987). Actual damages under the Privacy Act are limited to pecuniary harms only and do not extend to recoveries for "loss of reputation, shame, mortification, injury to the feelings, and the like." *FAA v. Cooper*, 566 U.S. 284, 295–97 (2012) (quotation marks omitted).

Fleck points to several alleged inaccuracies and omissions in the OIG report that, he claims, violated the Privacy Act and caused him actual damages in the form of lost job opportunities, legal fees, and increased health care costs. Defendant, in turn, argues that Fleck cannot maintain a Privacy Act suit against it because the OIG report is exempt from the substantive provisions of Privacy Act. And even if it is not, Defendant asserts that Fleck has failed to establish a material dispute of fact as to whether it violated any of the substantive provisions of the Privacy Act; whether any such violations were intentional or willful; and whether the violations proximately caused Fleck actual damages. The Court will address each of these arguments in turn.

## A.    Exemptions

Defendant maintains that the Court need not examine whether Fleck has adduced sufficient evidence to support a Privacy Act claim because two exemptions to the Privacy Act apply in this case. First, it claims that Fleck cannot assert a violation of Section 552a(e)(5) because the OIG report at issue is "part of a system of records that the VA has exempted from the requirements of section 552a(e)(5) and from the civil remedy provisions of Section 552a(g)

pursuant to 5 U.S.C. § 552a(j)(2)." Dkt. 49 at 11.  Second, Defendant contends that the report is

exempt from Section 552a(e)(6) because the disclosure of the report "would be required under

the Freedom of Information Act," pursuant to Section 552a(b)(2).  *Id.* at 13 (quotation marks

omitted).

Defendant raised each of these exemptions in its motion to dismiss.  *See* Dkt. 21 at 9, 19.

The Court deferred decision as to whether the exemptions barred Fleck's claims, however,

because the facts necessary to resolve Defendant's Section 552a(j)(2) affirmative defense were

not alleged on the face of the complaint, *id.* at 11–12, and because Defendant's argument with

respect to Section 552a(e)(6)'s Freedom of Information Act ("FOIA") exemption was

underdeveloped, *id.* at 19–20.  Now that the parties have completed discovery, Defendant has

reasserted its affirmative defenses.  At this stage, the Court concludes that the undisputed facts

establish that Section 552a(j)(2)'s exemption bars Fleck's claim under Section 552a(g)(1)(C) and

his Section 552a(g)(1)(D) claims predicated on alleged violations of Section 552a(e)(5).

Accordingly, the Court will grant Defendant's motion for summary judgment with respect to

those claims.  But, the Court also concludes that Section 552a(e)(6)'s FOIA exemption does not

apply in this case, and thus Defendant is subject to potential liability under Section

552a(g)(1)(D) for any violations of Section 552a(e)(6).

1.    *Section 552a(j)(2) Exemption*

Section 552a(j)(2) of the Privacy Act permits the "head of any agency" to "promulgate

rules . . . to exempt any system of records within the agency from any part of [the Privacy Act]"

"if the system of records is," as relevant here,

> maintained by an agency or component thereof which performs as its principal
> function any activity pertaining to the enforcement of criminal laws, including
> police efforts to prevent, control, or reduce crime or to apprehend criminals, and
> the activities of prosecutors, courts, correctional, probation, pardon, or parole
> authorities, and which consists of . . . information compiled for the purpose of a

criminal investigation, including reports of informants and investigators, and associated with an identifiable individual . . . .

5 U.S.C. § 552a(j)(2).  The Act excludes certain enumerated subsections from this exemption, however, including Section 552a(e)(6).  *Id.* § 552a(j).

Based on this provision, Defendant argues that the Section 552a(e)(5) predicate to Fleck's Section 552a(g)(1)(D) cause of action, as well as his Section 552a(g)(1)(C) cause of action, *see Lugo v. Dep't of Justice*, 214 F. Supp. 3d 32, 38–39 (D.D.C. 2016), is barred because the OIG report is part of a system of records that the VA has exempted under Section 552a(j)(2) and because the component of the VA that maintains that system of records "performs as its principal function any activity pertaining to the enforcement of criminal laws." 5 U.S.C. § 552a(j)(2).  To establish the exemption's applicability, Defendant submits a declaration from David Johnson, who has served as the Assistant Inspector General for Investigations since May 2019.  Dkt. 49-5 at 1 (Johnson Decl. ¶ 2).  Drawing on his knowledge of the VA OIG, including its organization and functions, and the systems of records that OIG uses to maintain information related to its investigations, Johnson attests, among other things, to the following:

- "The VA OIG is vested with law enforcement authority pursuant to Section 6(e)(3) of the Inspector General Act of 1978." *Id.* at 2 (Johnson Decl. ¶ 3).

- The Attorney General has issued guidelines for Inspectors General, including the VA OIG, that confirm that Inspectors General have "concurrent responsibility" with the FBI to "prevent[] and detect[] fraud and other criminal activity within their agencies." *Id.* (Johnson Decl. ¶ 3).

- "The Office of Investigations is the directorate within the VA OIG that investigates potential crimes and other violations of law involving VA programs and operations." *Id.* (Johnson Decl. ¶ 4).

- "The principal function of this directorate was, and is, investigative activity pertaining to the enforcement of criminal laws." *Id.* at 2–3 (Johnson Decl. ¶ 4).

- "In the 2017-2018 time frame . . . , this directorate was . . . staffed by more than 200 employees, including approximately 170 special agents (OPM series 1811)." *Id.* at 2 (Johnson Decl. ¶ 4).

- "During the time period at issue, the VA OIG's Administrative Investigations Division was located within the Office of Investigations and was staffed by approximately 7-10 investigators (OPM series 1810)." *Id.* at 3 (Johnson Decl. ¶ 4).

- "The investigation into potential conflicts of interest, nepotism, and false statements by Mr. Fleck was conducted by the Administrative Investigations Division." *Id.* at 3–4 (Johnson Decl. ¶ 5).

- "[A]lthough investigations undertaken by the Administrative Investigations Division generally focused on possible administrative violations, they easily could encompass potential violations of criminal law and result in a report of an investigation into suspected criminal activity." *Id.* at 3 (Johnson Decl. ¶ 4).

- "As is typical in such investigations, the investigation into Mr. Fleck's alleged conduct was undertaken with attention to whether the alleged conduct violated any criminal laws . . . , including 18 U.S.C. § 208 [acts affecting a personal financial interest] and 18 U.S.C. § 1001 [false statements]." *Id.* at 4 (Johnson Decl. ¶ 6).

- "During the course of the investigation, the VA OIG presented the case twice to the United States Attorney's Office for the District of Columbia for prosecution decisions, once in August 2017 and a second time in October 2017." *Id.* at 4 (Johnson Decl. ¶ 7).

- "The records collected and created as part of this investigation, including the final report, are contained in a system of records (11VA51) that is maintained by the Office of Investigations.  Those records encompass information pertaining to criminal law enforcement-related activities because they were compiled for the purposes of investigating possible violations of federal criminal laws (e.g., 18 U.S.C. § 208 and 18 U.S.C. § 1001), along with potential administrative violations." *Id.* at 4 (Johnson Decl. ¶ 8) (citation omitted).

According to Defendant, these attestations demonstrate that the OIG report qualifies for the Section 552a(j)(2) exemption because the Secretary of the VA, by rule, has exempted the relevant system of records, 11VA51, from the Privacy Act pursuant to Section 552a(j)(2).  Dkt. 49 at 11; *see* 38 C.F.R. § 1.582(b)(1) (exempting 11VA51).

Fleck disagrees and asserts that a genuine dispute of material fact exists as to whether VA OIG "perform[s] as its principal function any activity pertaining to the enforcement of criminal laws."  Dkt. 56 at 36.  First, Fleck points out that it is not sufficient that *one* of the agency's

functions is related to investigating criminal conduct; rather, it must be the agency's "[c]hief,"

"primary," or "most important" one. *Id.* at 38 (citing *Principal*, Black's Law Dictionary (11th

ed. 2019)).  Second, he asserts that the only evidence in the record with respect to OIG's

"principal function" comes from the Johnson Declaration. *Id.* at 37–38.  But that declaration,

Fleck says, is inadmissible because it contains expert testimony that was not timely disclosed

under Federal Rule of Civil Procedure 26(a)(2); because Johnson offers improper legal opinions

about the ultimate question of law for OIG's affirmative defense; and because Johnson has no

personal knowledge of the OIG's activities during the time in question. *Id.* at 38 & n.14; Dkt. 52

at 3.  Accordingly, Fleck moves to strike the Johnson Declaration from the record and preclude

the government from asserting the affirmative defense as a sanction.  Dkt. 52 at 1–2.

      As an initial matter, the Court will deny Fleck's motion to strike the Johnson Declaration.

The Court agrees with Defendant that Johnson is properly viewed as a fact witness. *See* Dkt. 57

at 3.  As Johnson explains in his declaration, the information he provides about the Office of

Investigations' historical organization, functions, and systems of records is knowledge that he

has "obtained in connection with [his] duties" as the head of that directorate, as well as his

"review of investigative records and the report issued regarding Robert Fleck." *See* Dkt. 49-5 at

1–2 (Johnson Decl. ¶ 2).  Thus, to the extent that Johnson's testimony draws an inference with

respect to the "principal function" of the Office of Investigations, that inference is a lay opinion

because it does not result from a "process of reasoning which can be mastered only by specialists

in the field," but rather observational "process[es] of reasoning familiar in everyday life." Fed.

R. Evid. 701, Advisory Committee's note to 2000 amendment.

      Cases involving testimony about business operations are instructive.  In that context,

numerous courts have held that Federal Rule of Evidence 701 does not restrict business owners

or officials from testifying or offering lay opinions about their office's operations, so long as their testimony or opinion is based on particularized knowledge they have obtained in the course of their duties.  *See, e.g.*, *Tex. A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 n.12 (5th Cir. 2003); *FTC v. Cap. City Mortg. Corp.*, No. 98-237, 2002 U.S. Dist. LEXIS 28693, at *4–6 (D.D.C. Mar. 28, 2002).  The Advisory Committee notes to Rule 701, moreover, expressly state that the 2000 amendment to Rule 701, which clarified that lay opinion testimony cannot be "based on scientific, technical, or other specialized knowledge," did "not purport to change" the pre-existing admissibility of lay opinions based on "the particularized knowledge that [an owner or officer of a business] has by virtue of his or her position in the business."  Fed. R. Evid. 701, Advisory Committee's note to 2000 amendment.  There is no reason why the same analysis should not also apply to the structure and practices of government offices.

Nor does the fact that some of the information to which Johnson attests predates his arrival at OIG render his testimony improper.  Johnson represents that he obtained all of the information in his declaration in the course of his duties as the head of the Office of Investigations.  In that capacity, Johnson undoubtedly has access to and has acquired knowledge about the past procedures, structure, and practices of the office he leads.  That is all that is required to establish personal knowledge.

Finally, the Court observes that Johnson's inference that the "principal function" of the Office of Investigations was "investigative activity pertaining to the enforcement of criminal laws" is not an improper legal conclusion.  The extent to which an activity is a "principal function" of an agency or component thereof is an empirical question, not a legal conclusion.  For that reason, Fleck's invocation of the D.C. Circuit's opinion in *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1214 (D.C. Cir. 1997)—which concern a

witness's opinion testimony regarding a "legal term of art"—is inapt.  Johnson may testify to an inference he has drawn based on his particularized knowledge of the structure and activities of the Office of Investigations.  Accordingly, the Court will deny Fleck's motion to strike.

Based on the undisputed facts set forth in the Johnson Declaration, the Court concludes that Defendant has met its burden to show that the OIG report is maintained in a system of records that is exempt from the requirements of Section 552a(e)(5) and from the cause of action under Section 552a(g)(1)(C).  The Court notes at the onset that Fleck directs his arguments at the functions of the VA OIG *as a whole*.  Those arguments miss the mark, however, because the appropriate unit of analysis is the VA OIG *Office of Investigations*, which is the "component" of the VA that "maintains" 11VA51, the system of records at issue.  This conclusion follows from the VA rule that exempts 11VA51 from the requirements of the Privacy Act, which lists the "location" of the system of records as the "Office of Investigations" and describes the records within this system as "maintained" by the "Assistant Inspector General for Investigations" and the "OIG Office of Investigations."   Privacy Act of 1974; System of Records, 73 Fed. Reg. 46713, 46715, 46716 (Aug. 11, 2008).  In invoking the exemption, the Secretary of the VA determined that the relevant "component" for the purpose of Section 552a(j) is the Office of Investigations, not the VA OIG more broadly or, for that matter, the Administrative Investigations Division within the Office of Investigations.

The Court considers the possibility that the term "component thereof" might limit the kinds of subdivisions within an agency that qualify for purposes of Section 552a(j) to only the largest units, such that VA OIG might qualify but the Office of Investigations might not.  The Court, however,  is unaware of any precedent supporting that reading of Section 552a(j)(2), and dictionaries define the word "component" broadly to mean "a constituent part," *Component*,

Webster's Third New International Dictionary (1993).  The D.C. Circuit, moreover, has indicated that individual prisons within the Bureau of Prisons system qualify as "component[s]" of a law enforcement agency for the purposes of Section 552a(j)(2), *Duffin v. Carlson*, 636 F.2d 709, 713 (D.C. Cir. 1980), which suggests that an office or department need not be the largest subdivision within the agency in order to qualify as a "component."  Finally, the fact that the Office of Investigations was, at the relevant time, "composed of multiple headquarters offices/divisions and seven regional field offices staffed by more than 200 employees," Dkt. 49-5 at 2 (Johnson Decl. ¶ 4), belies any suggestion that it lacks sufficient gravity to constitute a "component" of the VA.

With respect to the *Office of Investigations*, the undisputed facts show that the "principal function" of the office is to "perform[] . . . any activity pertaining to the enforcement of criminal laws."  5 U.S.C. § 552a(j)(2); *cf. Tijerina v. Walters*, 821 F.2d 789, 795 (D.C. Cir. 1987) ("[T]he [VA] OIG has a principal function of law enforcement.").  Specifically, the Johnson Declaration establishes that (1) the Office of Investigations "investigates potential crimes and other violations of law involving VA programs and operations," Dkt. 49-5 at 2 (Johnson Decl. ¶ 4), and (2) that an overwhelming percentage of the investigators at the Office of Investigations—170 out of 200—were criminal investigators (OPM series 1811), versus seven to ten employees who were administrative investigators (OPM series 1810), *id.* at 2–3 (Johnson Decl. ¶ 4).  The Johnson Declaration further establishes that, because VA OIG's investigation of Fleck involved an inquiry into whether Fleck "violated any criminal laws,"  the "records collected and created as part of this investigation, including the final report, are contained in a system of records (11VA51) that . . . encompass information pertaining to criminal law enforcement-related activities because they were compiled for the purposes of investigating possible violations of

federal criminal laws." *Id.* at 4 (Johnson Decl. ¶ 8). That system of records, in turn, has been exempted by rule from certain provisions of the Privacy Act, including, as relevant here, Section 552a(e)(5). *See* 38 C.F.R. § 1.582(b)(1); 73 Fed. Reg. 46713.

Fleck offers no evidence to the contrary. Rather, he points to evidence that administrative investigators within the Administrative Investigation Division ran his investigation and that OIG repeatedly referred to the inquiry as an "administrative investigation." *See* Dkt. 53-1 at 33–34 (Pl. SMF ¶¶ 159–65); Dkt. 58-1 at 54–56 (Def. Resp. to Pl. SMF ¶¶ 159–65). That evidence, however, is irrelevant to the inquiry under Section 552a(j)(2), which asks only (1) if the agency component that *maintains* the relevant system of records performs as its principal function activities pertaining to the enforcement of the criminal laws and (2) whether the record at issue was included in a system of records that consists of "information compiled for the purpose of a criminal investigation, including reports of informants and investigators." 5 U.S.C. § 552a(j)(2). As discussed, the component that maintained 11VA51 was the Office of Investigations, not the Administrative Investigation Division, and the undisputed evidence shows that 11VA51 consists of information pertaining to criminal law enforcement-related activities.

Thus, the Court concludes that the OIG report is part of a "system of records" that is "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws" and which consists of "information compiled for the purpose of a criminal investigation." *Id.* Because the Secretary of Veterans Affairs has exempted 11VA51 from the requirements of Section 552a(e)(5), *see* 73 Fed. Reg. at 46717, the Court concludes that Fleck's claims based on violations of that section are barred by Section 552a(j)(2).

The VA's regulation also purports to exempt the agency from Section 552a(g), which includes both of Defendant's causes of action in this case. As the D.C. Circuit has explained, however, that exemption is unenforceable. *See Tijerina*, 821 F.3d at 795–96. Section 552a(g) is not a substantive provision; it is a grant of jurisdiction and waiver of sovereign immunity "directed not towards agencies but towards courts and aggrieved individuals." *Id.* "Although agencies may exempt *systems of records* from the Act, they may not exempt *themselves*." *Lugo*, 214 F. Supp. 3d at 39 (citing *Tijerina*, 821 F.3d at 795). Thus, "an agency has no power under the Act to exempt itself from the civil liability provisions of subsection (g)." *Tijerina*, 821 F.3d at 795; *Hurt v. Cromer*, No. 09–5224, 2010 WL 8753255, at *1 (D.C. Cir. June 11, 2010) (per curiam).

There is an exception to this rule, however, with respect to Section 552a(g)(1)(C). As this Court has previously held, "because the slight variation in wording between (e)(5) and (g)(1)(C) is 'of no substantive significance,'" a plaintiff has "no cause of action under subsection (g)(1)(C)" if his suit is based on a record that is exempt under subsection (e)(5). *Lugo*, 214 F. Supp. 3d at 39 (quoting *Doe v. United States*, 821 F.2d 694, 699 (D.C. Cir. 1987)). Accordingly, the Court will grant Defendant's motion for summary judgment with respect to Fleck's Section 552a(g)(1)(C) claims and those of Fleck's Section 552a(g)(1)(D) claims that are premised on violations of Section 552a(e)(5).

2.    *Section 552a(e)(6) Exemption*

All is not lost for Fleck, however. Because Section 552a(j)(2) expressly prohibits an agency from exempting records from the requirements of Section 552a(e)(6), Fleck's Section 552a(g)(1)(D) claims predicated on alleged violations of Section 552a(e)(6) still remain. Defendant sees things differently. In its view, a second exemption bars liability with respect to Fleck's claims predicated Section 552a(e)(6). Specifically, it observes that Section 552a(e)(6)'s

requirement that an agency make reasonable efforts to assure that records are accurate, complete, timely, and relevant prior to dissemination does not apply if "the dissemination is made pursuant to subsection (b)(2)" of the Privacy Act. Dkt. 49 at 13 (quoting 5 U.S.C. § 552a(e)(6)). Subsection (b)(2), in turn, refers to situations in which the "disclosure of [a] record would be . . . required under section 552 of this title"—that is, the Freedom of Information Act. 5 U.S.C. § 552a(b)(2).

The parties agree that the dissemination of the OIG report at issue was not made pursuant to a FOIA request. Defendant insists, however, that the OIG report nevertheless falls within the FOIA exemption to Section 552a(e)(6). Its argument why takes some unpacking, but, in essence, Defendant suggests that the D.C. Circuit, in *Bartel v. FAA*, 725 F.2d 1403 (D.C. Cir. 1984), recognized some ambiguity in the text of Section 552a(b)(2), and, in so doing, left the door open for an agency "to invoke Section 552a(b)(2) when another source of mandatory disclosure (such as custom or another federal statute) *requires* the public disclosure of the record independent of FOIA." Dkt. 49 at 14–15 (citing *Bartel*, 725 F.2d at 1413). This interpretation of subsection (b)(2) comes from long-standing Office of Management and Budget guidelines, which Defendant maintains are entitled to deference. *Id.* at 15. And since OIG reports are required by statute to be disclosed publicly, *see* 38 U.S.C. § 312(c)(1)(C), Defendant submits that OIG reports should be treated as records that "would be . . . disclosed" pursuant to FOIA for the purpose of Section 552a(e)(6). Dkt. 49 at 18.

In *Bartel*, the D.C. Circuit considered whether a disclosure was exempt from the Privacy Act because it "only imparted information that the [defendant] would have been required to release pursuant to a Freedom of Information Act . . . request." 725 F.2d at 1411. The disclosure at issue in *Bartel* was not made in response to a FOIA request, but the defendant

nonetheless argued that "[S]ection 552a(b)(2) . . . allow[s] unrestricted disclosure [of information] unless the information falls within a FOIA exemption, whether or not the information has been requested." *Id.* at 1412. The D.C. Circuit began by observing that "the language of section 552a(b)(2) standing alone may be subject to different interpretations" with respect to whether the phrase "would be . . . required under [FOIA]" refers to information that could, hypothetically, be released pursuant to a FOIA because it does not fall within a FOIA exemption, or whether it instead refers only to information that is actually released pursuant to a FOIA request. *Id.* The court of appeals ultimately determined, however, that subsection (b)(2) "must be read generally to preclude nonconsensual disclosure of Privacy Act material *unless the agency acts pursuant to a FOIA request*." *Id.* (emphasis added).

The D.C. Circuit reached this conclusion by examining "the differing thrusts of the FOIA and the Privacy Act." *Id.* It explained that "FOIA was meant to limit agency discretion to deny public access to information in its files," while "[t]he Privacy Act, on the other hand, was designed to limit agency discretion to reveal personal information in its files." *Id.* And although the two statutes "undoubtedly . . . overlap and even conflict" in some areas, the court reasoned that "neither statute was passed to increase agency discretion as to what to disclose or hold back," and thus "[i]t would be unreasonable to read . . . FOIA, as appellees do, as *increasing agency discretion* to disclose information where disclosure is otherwise prohibited by the Privacy Act." *Id.* It follows, the court concluded, that "[o]nly when the agency is *faced with a FOIA request* for information that is not within a FOIA exemption, and therefore has no discretion but to disclose the information, does the FOIA [exemption] to the Privacy Act come into play." *Id.* (emphasis added).

Although the D.C. Circuit considered "this reasoning by itself" to be "persuasive," it also

noted that the Privacy Act's legislative history[2] and the Office of Management and Budget's

Guidelines on the Act ("OMB Guidelines"), *see* 40 Fed. Reg. 28949–78 (July 1, 1975),

"supported" its view.  In particular, the court pointed to the following language from the OMB

Guidelines' discussion of subsection (b)(2), which states:

> Given the use of the term "required," agencies may not voluntarily make public
> any record which they are not required to release (i.e. those that they are
> permitted to withhold) without the consent of the individual . . . .
>
> Records which have traditionally been considered to be in the public domain and
> are required to be disclosed to the public, such as many final orders and opinions
> of quasi-judicial agencies, press releases, etc. may be released under this
> provision without waiting for a specific Freedom of Information Act request
> . . . . Records which the agency would elect to disclose (i.e., they are permitted
> to be withheld under the FOIA) may only be released to the public under the
> "routine use" provision.

*Bartel*, 725 F.2d at 1412–13 (quoting OMB Guidelines at 21–22, 40 Fed. Reg. at 28954).

Although the D.C. Circuit cited this language as general support for its conclusion that

subsection (b)(2)'s applies only when the agency is "required" to disclose information pursuant

to a FOIA request, the court also observed that the OMB Guidelines "suggest a possible

exception to this interpretation for information that is traditionally released by an agency to the

public without a[] FOIA request."  *Id.* at 1413.  At the end of the day, however, the court

---

[2] With respect to the Privacy Act's legislative history, the Court observed that early versions of
the bill exempted an agency from the Act's disclosure requirements "when disclosure would be
required *or permitted* pursuant to . . . the Freedom of Information Act," but "the final
compromise version of the Act . . . limited [the FOIA exemption] to those disclosures *required,*
and not to all those *permitted,* under the FOIA."  *Bartel*, 725 F.2d at 1413.

concluded that it "need not decide whether such an exception is proper, or if so what its exact scope may be," because the disclosures in *Bartel* were not such disseminations.  *Id.*[3]

Because VA OIG reports are "required to be disclosed to the public" by statute, 38 U.S.C. § 312(c)(1)(C), Defendant seizes on this last passage in *Bartel*'s discussion of the exemption to urge the Court to accord *Chevron* deference to the OMB's interpretation of subsection (b)(2) and recognize that the OIG report "may be released under [subsection (b)(2)] without waiting for a specific [Freedom of Information Act] request" and, therefore, is exempt from Section 552a(e)(6).  Dkt. 49 at 16 (citing 40 Fed. Reg. 28954); *id.* at 15 (citing *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984)); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1120 (D.C. Cir. 2007) ("Congress explicitly tasked the OMB with promulgating guidelines for implementing the Privacy Act, and we therefore give the OMB Guidelines 'the deference usually accorded interpretation of a statute by the agency charged with its administration.'" (citation omitted) (quoting *Albright v. United States*, 631 F.2d 915, 920 n.5 (D.C. Cir. 1980)).  The Court is unpersuaded for several reasons.

First, Congress might reasonably have opted to exempt documents from the Privacy Act that are traditionally considered to be part of the public domain or that are subject to mandatory disclosure under a different statutory scheme, that is not the statute that it enacted.  Rather, Section 552a(e)(6) requires agencies to "make reasonable efforts to assure that . . . records [about

---

[3] In its memorandum in support of dismissal, Defendant cites to two cases from this district that apply the interpretation of subsection (b)(2) set forth in the OMB Guidelines on the theory that *Bartel* "recognized [an] exception to th[e] general rule [requiring a FOIA request] for information traditionally released to the public without . . . a [FOIA] request."  *Tripp v. Dep't of Defense*, 193 F. Supp. 2d 229, 236 (D.D.C. 2002); *accord Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 42 (D.D.C. 2004).  Neither decision, however, considers the next line of *Bartel*, in which the D.C. Circuit asserts that it is "not decid[ing] whether such an exception is proper."  725 F.2d at 1413.

an individual] are accurate" before "disseminating" those records outside the government,

"unless the dissemination is made *pursuant to subsection (b)(2)*"—and subsection (b)(2)

references *only* FOIA and no other statute.  Congress could have easily written Section

552a(e)(6) to exempt records disclosed pursuant to any other statutory mandate or even pursuant

to Section 552a(b)(3), which concerns disclosures "for a routine use," but it did not do so;

instead, it limited the exemption to the dissemination of records pursuant to FOIA.  The Court

cannot read into the Privacy Act what Congress did not place there, nor does *Chevron* deference

permit an agency or the Court to disregard the plain terms of a statute.  *See, e.g.*, *United States v.

Mead Corp.*, 533 U.S. 218, 227 (2001) ("[A] regulation is [not] binding in the courts [if it is] . . .

manifestly contrary to the statute."); *Scarborough v. Harvey*, 493 F. Supp. 2d 1, 13 n.28 (D.D.C.

2007) ("[T]o the extent that the OMB Guidelines . . . contradict the plain language of the Privacy

Act itself, they should be accorded no special interpretive weight.").

　　　The limitation of Section 552a(b)(2)'s exemption to FOIA is a sensible one, moreover,

because that exemption "represents a Congressional mandate that the Privacy Act not be used as

a barrier to FOIA access."  *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 79 (D.C. Cir. 1982).

Public access to agency records pursuant to FOIA would be stymied if the agency always had to

obtain the consent of an individual (as Section 552a(b) otherwise requires) before that

individual's records could be released pursuant to a FOIA request.

　　　Second, although *Bartel* noted that "the language of [S]ection 552a(b)(2) *standing alone*

may be subject to different interpretations," 725 F.2d at 1412 (emphasis added), courts must

exhaust all of the traditional rules of statutory interpretation before invoking *Chevron* deference,

*see Chevron*, 467 U.S. at 843 n.9, and *Bartel* goes on to hold—in the very next clause—that

Section 552a(b)(2) "*must be read* generally to preclude nonconsensual disclosure of Privacy Act

material unless the agency acts *pursuant to* a FOIA request," 725 F.2d at 1412 (emphases

added).  When subsection (b)(2) is read within the broader context of subsection (b), moreover, it

becomes clear that the phrase "would be . . . required under [FOIA]" refers only to disclosures

made subject to an actual FOIA request, not disclosures that could be made under some

hypothetical FOIA request.  To illustrate, subsection (b) provides that "[n]o agency shall disclose

any record which is contained in a system of records by any means of communication to any

person, or to another agency," without the prior approval of the individual to whom the record

pertains, "unless disclosure of the record would be"—"*to*" one of nine categories of recipients, 5

U.S.C. § 552a(b)(1), (4)–(10), (12) (emphasis added), "*for* a routine use," *id.* § 552a(b)(3)

(emphasis added), "*pursuant* to the order of a court," *id.* § 552a(b)(11) (emphasis added), or

"*required* under [FOIA]," *id.* § 552a(b)(2) (emphasis added).  Because each of the surrounding

provisions refers to actual—not hypothetical—disclosures, the same must apply to subsection

(b)(2).  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 569–70 (1995).

To be sure, *Bartel* declined to decide whether the OMB Guidelines' exception for

information that is traditionally released to the public without a FOIA request is "proper."  725

F.2d at 1413.  But the OMB Guidelines' interpretation of subsection (b)(2) cannot be reconciled

with *Bartel*'s reasoning or the overall structure of Section 552a(b).  In holding that "the [FOIA

exemption] is only invoked when the agency acts pursuant to a FOIA request," *id.* at 1413 n.18,

*Bartel* necessarily construed the phase "would be" to refer to actual, not hypothetical, disclosures

under FOIA.  And, as explained above, this conclusion is consistent with the surrounding

provisions of Section 552a(b), all of which contemplate actual disclosures.  Because, as a basic

rule of statutory interpretation, the same statutory phrase cannot simultaneously hold two

incompatible meanings, *see Clark v. Martinez*, 543 U.S. 371, 386 (2005), the phrase "would be"

cannot refer to hypothetical FOIA disclosures when information is required to be or is traditionally released to the public, but actual disclosures in all other contexts.

Finally, the Court has no quarrel with the proposition that a specific mandatory-disclosure provision trumps a more general prohibition on disclosure like Section 552a(b) of the Privacy Act. *See Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). But, importantly, the claims in this case do not challenge the *release* of the OIG report but, rather, OIG's purported failure to ensure that the material contained in that report was accurate and complete "prior to disseminat[ion]," 5 U.S.C. § 552a(e)(6). Absent a specific provision that states otherwise, then, the fact that VA OIG reports must be publicly disclosed does not by itself absolve Defendant of the requirement to ensure that they are accurate and complete.

Accordingly, the Court concludes that the dissemination of the OIG report in this case was not "made pursuant to subsection (b)(2)," and thus, the report is not exempt from the requirements of Section 552a(e)(6).

## B.    Privacy Act Violations

Turning to the merits, Section 552a(g)(1)(D) permits a plaintiff to recover damages when an agency "fails to comply with any . . . provision of [the Privacy Act], or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D). As discussed, although Fleck alleges violations of Section 552a(e)(5) and (e)(6), he may recover only for violations of Section 552a(e)(6), which provides that an agency shall, "prior to disseminating any record about an individual to any person other than an agency, . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(e)(6).

Fleck argues that OIG's report violates Section 552a(e)(6) because it "contains numerous inaccurate statements of fact and omits exculpatory and mitigating evidence." Dkt. 56 at 15. These inaccuracies and omissions, Fleck claims, violated the prevailing professional standards for Office of Inspector General investigations and the VA OIG's own internal standards and, thus, "fell below any arguable standard of 'reasonableness.'" *Id.* The Court concludes that Fleck has adduced sufficient evidence to create a genuine dispute of material fact as to whether the report's omissions violated OIG's obligation to undertake "reasonable efforts" to ensure that its report was "accurate" and "complete." 5 U.S.C. § 552a(e)(6).

In support of his Privacy Act claims, Fleck submits an expert report from John Hartman, a former Deputy Inspector General with over 30 years' experience in three Offices of Inspector General in the federal government. Dkt. 56-2 at 2. Hartman analyzes VA OIG's conduct in Fleck's case according to professional standards issued by the Council of the Inspector General on Integrity and Efficiency ("CIGIE") and VA OIG's own internal guidelines, which incorporate the CIGIE standards. *Id.* at 3, 8–11. Based on these standards, Hartman identifies a number of "inconsistencies between the VA OIG's actions on this case and CIGIE's standards and the VA OIG's internal guidance," which, in his professional opinion, render the report "both inaccurate and incomplete in several material ways." Dkt. 56-2 at 12.

First, Hartman observes that Deputy Secretary Bowman's second concurrence letter, which retracts his previous concurrence and "raises questions about the accuracy and completeness of the [r]eport, is not included with the public [r]eport, thus making the [r]eport incomplete and inaccurate." *Id.* at 13.

Second, Hartman finds fault with OIG's failure to solicit Fleck's comments on "all substantiated findings" near "the conclusion of the investigation," so that Fleck could respond

with "potentially exculpatory or mitigating information," in violation of VA OIG Directive 51Q 101. *Id.* Hartman notes, in particular, that after Fleck was last interviewed, VA OIG completed "a number of additional investigative steps, including follow-up interviews with witnesses" and "requested, obtained, and reviewed telephone records." *Id.*

Third, Hartman opines that "[r]elevant and material information was not included in the VA OIG Report and in some instances, not obtained during the investigation." *Id.* According to Hartman, these omissions show that VA OIG "report[ed] on evidence sufficient to substantiate the allegations without attempting to present potentially exculpatory or contradictory evidence or information that adds relevant context to those findings." *Id.* In particular, Hartman points to eleven examples of (what he regards as) material omissions:

(1) Hartman faults the VA OIG for failing to interview Buonocore about the June 2016 call during which Wiercinski was first suggested as a candidate, even though Fleck told OIG investigators during his interview that it was Buonocore who suggested his wife, and not he. *Id.* at 14. Buonocore later executed a declaration in which he explained that he first suggested Wiercinski as a candidate and that he did not recall Fleck ever recommending Wiercinski for the position, which contradicts the OIG report's finding that Fleck "actively and openly solicited" his wife's employment during that call. *Id.*

(2) Although the report concludes that Fleck "used his position as an SES manager . . . to advocate for the employment of his wife," Hartman opines that the report omits material and relevant context that Fleck did not advocate for his wife while the Best Qualified Panel was reviewing candidates, including testimony from all three members of the Best Qualified Panel that they received no pressure to hire Wiercinski and that she was selected because she was far and away the most qualified candidate. *Id.* at 15–17.

(3) Hartman further criticizes the report for omitting important context about the testimony and origins of the e-discovery position. *Id.* at 17–18. Although the report concludes that Fleck "participated in establishing" the e-discovery position "for" his wife, Dkt. 49-3 at 20, Hartman observes that the OIG report omits testimony from Cameron Gore and Benjamin Diliberto that establishes that the need for an e-discovery position had been discussed at VA OGC before Fleck's arrival at OGC in May 2016. Dkt. 56-2 at 17–18.

(4) Hartman indicates that the OIG report does not address conflicting testimony regarding Fleck's apparent participation in conversations about converting a general staff attorney position in the Real Property Law Group to an e-discovery position. *Id.* at 18–19. Although the report quotes Cameron Gore's recollection that Fleck was involved in a collective discussion, Hartman observes that it omits testimony from others who did not remember Fleck having involvement and instead recalled a different individual making the decision to use the general attorney position in Real Property Law Group for an e-discovery position. *Id.* at 19.

(5) Hartman opines that the report "does not fully address potentially material exculpatory information regarding Mr. Fleck's involvement in the position description or vacancy announcement." *Id.* at 19. Hartman acknowledges that the report "outlines various emails and discussions where Mr. Fleck was a participant," but he notes that the report "does not establish what impact, if any, he had on the document's content." *Id.* In addition, he observes that the report omits testimony from Cameron Gore, in which he states: "to suggest that [Fleck] created the [position description] and there was some way that he drafted it to steer it, um, that's, that's bogus. That's bogus." *Id.*

(6) Hartman also takes issue with the OIG report's conclusion that "[t]here is a direct connection between Mr. Fleck referring his wife to Mr. Gore, and Mr. Gore being influenced by

that referral." Dkt. 49-3 at 20.  In Hartman's view, this statement is misleading because Gore

told OIG investigators that Fleck had no influence over the hiring decision.  Dkt. 56-2 at 20.  In

particular, Gore stated during his interview: "I assure you, if Fleck had ever tried to influence

me, and, and if he had—and, and I say this humbly, but I'm going to be honest with you.  Bob

Fleck does not have a bit of influence over me."  Gore also told investigators: "if [Wiercinski]

wasn't the best qualified, she wasn't going to get selected" and "the review process, the

recruitment process, came through my section.  [Fleck] had no say in that."  *Id.*  Nevertheless,

Hartman explains, the OIG report omits this context, which "may have provided a more

complete presentation of the facts about the entire hiring process and . . . more completely and

accurately characterize[d] his influence on the final hiring decision."  *Id.* at 21.

(7) Although the report accurately describes Wiercinski as the e-discovery coordinator

attorney assigned to support the Contract Litigation Team, which Fleck managed, Hartman

criticizes the report for omitting testimony that, because Wiercinski was a member of the Real

Property Law Group and not the Procurement Law Group, Wiercinski did not report to Fleck,

and Fleck did not control her "assignments [or] feedback."  *Id.* at 21–22.  The exclusion of this

evidence, Hartman opines, means that the report provides incomplete context regarding whether

"Mr. Fleck actually had any role in assigning work to Ms. Wiercinski or influencing her

appraisal—not just a potential role."  *Id.* at 23.

(8) Hartman contends that report "does not contain sufficient evidence" to support the

conclusion that Fleck and Wiercinski made "false statements about when [Wiercinski] was

selected for the e-Discovery position to lessen the potential consequences" of sharing VA

sensitive data and that those statements were "not simple lapses in memory or confusion

regarding dates."  *Id.* at 23.

(9) Hartman asserts that the report also provides incomplete information about the ethics trainings that Fleck received.  *Id.* at 23.  Although the report accurately states that Fleck, Gore, and Hipolit received ethics training regarding the hiring of relatives, Hartman notes that the report fails to mention that the training occurred on September 23, 2016, which was *after* Fleck's alleged advocacy of Wiercinski.  *Id.*

(10) Hartman also criticizes the report's failure to provide additional detail regarding the call log analysis that OIG undertook to verify Fleck's and Wiercinski's claim that Gore informally offered her the position in mid to late September 2016.  Hartman points out that, during the month of September, Wiercinski received several calls from numbers listed as "Unavailable."  *Id.* at 24.  The report, however, does not mention the unavailable calls nor does it identify what steps, if any, investigators took to determine if these may have been from Gore.  *Id.*

(11) Finally, Hartman faults VA OIG for insufficiently informing VA ethics officials about the results of its investigation and the allegations of ethical misconduct against Fleck.  Although VA OIG communicated with ethics officials to determine if anyone had sought contemporaneous ethics advice regarding the Fleck/Wiercinski situation, Hartman observes that it is unclear whether VA OIG informed those officials about the results of the investigation or sought their advice about whether Fleck's actions amounted to "advocacy."  *Id.* at 24–25.

For its part, Defendant does not contest the factual bases for Hartman's opinions—that is, it does not contest that the identified evidence was, in fact, omitted from OIG's report.  *See* Dkt. 49 at 28.  Rather, it insists that the omissions were reasonable, immaterial, and would not alter the ultimate factual findings and conclusions in the report.  *Id.*

Upon consideration of the Hartman report and the evidence in the record, the Court concludes that Defendant is entitled to summary judgment with respect to two of the potential

violations that Hartman identifies.  First, although it is true that Defendant has not updated the

public version of its report to replace VA Deputy Secretary Bowman's concurrence letter to

reflect his disagreement with all of the report's conclusions except the finding on sharing

sensitive information, that omission is not cognizable under Section 552a(e)(6).  To be sure, the

absence of the VA Deputy Secretary's second letter renders OIG's report highly misleading,

since it suggests, inaccurately, that VA management still concurs in full with the report's

findings.  The problem for Fleck, however, is that Section 552a(e)(6) obligates an agency to

undertake reasonable efforts to ensure that a record is complete and accurate only "prior to

disseminat[ion]," and, here, the VA Deputy Secretary rescinded his concurrence after the

publication of the report.  Fleck does not point the Court to any authority establishing that

Section 552a(e)(6) imposed an obligation on Defendant to update the report.  Accordingly, the

Court will grant summary judgment in Defendant's favor with respect to that claim.

The Court also concludes that there is no genuine dispute of material fact that Defendant

undertook "reasonable efforts" to ensure the accuracy of the report's conclusion that Fleck and

Wiercinski made false statements regarding the timing of her offer.[4]  "It is well-established that,

'generally speaking, the Privacy Act allows for correction of facts but not correction of opinions

or judgments.'" *Mueller v. Winter*, 485 F.3d 1191, 1197 (D.C. Cir. 2007) (quoting *McCready v.*

*Nicholson*, 465 F.3d 1, 19 (D.C. Cir. 2006)).  Thus, in order to be actionable, "a subjective

judgment" must be "'based on a demonstrably false' factual premise."  *Mueller*, 485 F.3d at

1197 (quoting *White v. Off. of Pers. Mgmt.*, 787 F.2d 660, 662 (D.C. Cir. 1986)).  Although

Hartman contends that the report "does not contain sufficient evidence" to support its conclusion

---

[4] This does not constitute a finding that the conclusion was (or was not) correct, but only that the
agency's failure to undertake further efforts to ensure the conclusion's accuracy does not amount
to a violation of the Privacy Act.  *See* 5 U.S.C. § 552a(e)(6).

that Fleck and Wiercinski gave false statements, Dkt. 53-3 at 23, the undisputed facts in the

record establish otherwise. Specifically, the report details how the investigators interviewed

Gore, who did not recall the timing of his communications with Wiercinski but that he would not

have made a call until after he received a recommendation from the hiring panel. Dkt. 49-3 at

18–19 (OIG report); *see also* Dkt. 58-4 at 2–3 (Gore Tr. at 63–65, 67–68). The report then

explains that OIG analyzed Gore's, Wiercinski's, and Fleck's telephone records, which revealed

no calls from Gore to Wiercinski until after October 4, 2016. Dkt. 49-3 at 19 (OIG report). This

finding was also consistent with the email record, which indicated that Gore did not notify

Wiercinski that she had been received the position until an hour after he received the Best

Qualified Panel's recommendation. *Id.* at 33. Fleck faults OIG for "conduct[ing] no additional

investigation into the 18 calls" to or from "unavailable" numbers on Wiercinski's phone during

that period, Dkt. 53 at 10, but he does not identify any additional steps that Defendant could have

taken to identify these numbers, nor does he offer evidence to suggest, in the event that Gore

called from a different VA phone, that such a call would appear as "unavailable" when calls

from Gore's VA office phone were identifiable, Dkt. 58 at 13. In light of this undisputed

evidence, the Court concludes that no reasonable jury could find that Defendant failed to "make

reasonable efforts" to investigate Fleck's and Wiercinski's claim that Gore had informally

offered the position in September.

With respect to the remaining omissions and inaccuracies Hartman identifies, however,

the Court concludes that a genuine dispute of material fact exists as to whether OIG violated

Section 552a(e)(6). To the extent that Defendant asserts that these omissions were reasonable,

Hartman disagrees, and his expert report cites to specific provisions of the professional and

internal standards governing OIG investigations that each omission ostensibly violated. Dkt. 53-

3 at 12–25. That disagreement is sufficient to create a material fact dispute as to whether Defendant's efforts to assure the report's completeness and accuracy were reasonable.

As discussed, Defendant also argues that the omitted evidence was immaterial or would not have altered the report's conclusions, but in doing so it misapprehends the standard for a violation under Section 552a(e)(6). Section 552a(e)(6) requires an agency to assure that a record is "accurate" and "complete." Even if additional evidence would not alter a report's bottom line, it might nevertheless provide important context that bears on the subject's level of culpability and cast the report's conclusions in a different light. That is precisely what Fleck says happened here. Thus, viewed in the light most favorable to Fleck, the Court concludes that there is sufficient evidence in the record from which to conclude that the report was incomplete or inaccurate.

## C.    Intent or Willfulness

Defendant further contends that, even if Fleck can establish a violation of the Privacy Act, the Court should nevertheless grant summary judgment in Defendant's favor because Fleck has not adduced any evidence that it violated Section 552a(e)(6) intentionally or willfully. The Court is unpersuaded.

As Defendant correctly observes, a plaintiff cannot recover damages under the Privacy Act unless he shows that the agency "acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). The intentional-or-willful standard "does not require the [defendant] to set out purposely to violate the [Privacy] Act." *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987). But the plaintiff must prove that the agency's actions were (1) "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful," (2) "somewhat greater than gross negligence," (3) "committed without grounds for believing [them]

to be lawful," or (4) "[in] flagrant[] disregard [of] others' rights under the Act." *Maydak v. United States*, 630 F.3d 166, 180 (D.C. Cir. 2010) (emphasis and quotation marks omitted).  For present purposes, so long "as there is . . . a genuine issue of material fact as to whether [the defendant] acted with something greater than gross negligence . . . , the issue cannot be disposed of on summary judgment." *Tijerina*, 821 F.2d at 799.

At this stage, Fleck has adduced sufficient evidence of intent or willfulness to survive a motion for summary judgment.  Fleck's theory is that Defendant pursued its investigation only with an eye toward substantiating the allegations against him rather than providing a complete account of his culpability.  *See* Dkt. 53 at 28.  This theory finds some support in Defendant's failure to interview Buonocore, even after Fleck informed OIG that Buonocore would have exculpatory information concerning Fleck's role in the hiring of his wife, and in OIG's failure to offer a satisfactory explanation for why it did not do so.  Defendant attempts to defend this omission by explaining that Buonocore had retired by the time of the investigation (which meant that OIG could not compel his testimony), *see* Dkt. 58-1 at 43 (Def. Resp. to Pl. SMF ¶ 116), but Defendant offers no contemporaneous evidence to explain why OIG investigators did not ask him to testify voluntarily.

Similarly, Defendant does not satisfactorily explain why it excluded Diliberto's testimony from the report, even though Diliberto's testimony suggests that Fleck's role in the creation of the e-discovery position and the hiring process was less significant than the report made it out to be.  Defendant defends its actions by explaining that the report was only focused on the narrow question of "advocacy" and the testimony of Diliberto and others was irrelevant to that specific question.  Dkt. 49 at 33.  What that argument misses, however, is that Section 552a(e)(6) required Defendant to ensure not only that the information in the report was relevant

but also that it was *complete*.  To appreciate the importance of completeness in operation, one

need look no further than VA Deputy Secretary Bowman's decision to retract his concurrence,

after reviewing Buonocore's and Diliberto's excluded testimony.

Finally, Fleck has also adduced direct evidence that arguably casts doubt on the

objectivity of OIG's approach.  Specifically, he points to an email sent by an OIG employee,

who, upon realizing that the report at one point erroneously used the word "indict" instead of

"indicate," joked that the error was a "Freudian" slip, thereby suggesting that OIG had pursued

its investigation with an indictment as a goal.  Dkt. 58-1 at 29 (Def. Resp. to Pl. SMF ¶ 81).

Put together, the Court concludes that this evidence creates a genuine issue of material

fact as to whether Defendant acted "with something greater than gross negligence" with respect

to its obligation to assure the completeness of its report, and, thus, the Court declines to grant

Defendant's motion for summary judgment on that ground.

## D.    Causation and Actual Damages

That brings the Court to the final elements of a Privacy Act claim: that a violation of the

Act proximately caused Fleck actual damages.  *Dickson*, 828 F.2d at 37.  "To make out a

damages claim, the alleged adverse [effects] must result from the inaccuracy of the record[], not

the mere existence of the record[]."  *Thompson v. Dep't of State*, 400 F. Supp. 2d 1, 19 (D.D.C.

2005).

Fleck identifies six "adverse effects" that he claims he suffered because of Defendant's

public dissemination of the allegedly inaccurate and incomplete report.[5]  Dkt. 56 at 31.  First, he

---

[5] Fleck refers to two of his theories for actual damages as "adverse determinations," in reference
to the standard under Section 552a(g)(1)(C).  However, because those adverse determinations
could easily be characterized as "adverse effects," the Court will treat them as such for the
purpose of assessing Fleck's claim under Section 552a(g)(1)(D).

argues that the report caused his proposed demotion, and, although that demotion ultimately did not occur, Fleck says that it had a "quantifiable *adverse effect* on [him] because he had to pay thousands of dollars to counsel to challenge the proposed discipline." *Id.* Second, Fleck maintains that the report "caused [him] pecuniary harm when he was rejected for multiple private sector jobs after the publication of the report." *Id.* at 32. Third, he claims that the report caused him to be denied a promotion to OGC Deputy General Counsel in November 2017 because "it is possible that someone within OGC knew about the OIG's decision to substantiate the allegations before November 2017." *Id.* at 34. Fourth, Fleck asserts that the report caused him to be "rejected for a job with the Department of Defense in April 2018." *Id.* at 35. Fifth, he contends that the report caused "adverse effects on his health that then caused increased health care costs." *Id.* at 36. And sixth, he argues that he "suffered adverse effects from the [r]eport when VA employees used the [r]eport as a basis for other whistleblower allegations against him," thereby causing him to "incur[] legal fees to defend (successfully) against them." *Id.*

Although causation is ordinarily a question of fact for the jury, summary judgment is appropriate when the plaintiff "fail[s] to proffer any evidence . . . from which a reasonable jury could find the required causal link" between the agency's Privacy Act violation and actual damages the plaintiff has suffered. *Williams v. Johnson*, 701 F. Supp. 2d 1, 17 (D.D.C. 2010). Here, the Court concludes that—with one exception—Fleck has not adduced sufficient evidence to create a genuine dispute of material fact as to whether the inaccuracies or any incompleteness in the OIG report proximately caused the adverse effects he identifies, and, thus, the Court will grant Defendant's motion for summary judgment with respect to those claims.

Fleck's claim that the report caused his rejection for multiple private sector jobs fails for two reasons: first, he has not adduced sufficient evidence to permit a reasonable jury to find that

anyone at the companies to which he applied was aware of the report, and, second, he has not created a genuine dispute of material fact as to whether he would have been selected for any of the positions but for the inaccuracies in the report.  With respect to the first point, Fleck proffers an expert report from Deb Cohen, an executive hiring professional, who opines that "[i]nternet searches of executive candidates are highly likely;" that "[n]egative information about candidates found in internet searches has a detrimental effect on the decision whether to interview or hire those candidates;" and that a "search of Mr. Fleck and Veterans Affairs" on popular search engines reveals the OIG report.  Dkt. 53-5 at 19 (Cohen Rep.).  As Defendant points out, however, Fleck did not receive an interview invitation for any of these positions, and Cohen does not offer an opinion as to *when* in the hiring process such a search is likely to occur or whether employers are likely to conduct an internet search of candidates as part of deciding whom to interview.  Dkt. 49-10 at 13–15 (Cohen Dep. at 131–32, 141).  Fleck, moreover, has adduced no evidence from the companies to which he applied about their hiring processes or about Fleck's application.  In any event, even if Fleck were able to raise an inference that one or more of the private-sector companies he applied to was aware of the OIG report, Fleck has proffered no evidence to suggest that he might have been selected for the positions but for the inaccuracies in the report.  Fleck did not receive an interview for any of the positions, was never told why, and did not explore that question in discovery.  Nor has Fleck offered any evidence that he would have been among the best qualified candidates for the position: he does not identify who was eventually selected for each position or produce evidence of those selectees' qualifications. Fleck asserts that he was "qualified" for the positions, Dkt. 53-1 at 28 (Pl. SMF ¶ 124), but notably does not argue that he was among the best qualified candidates.

Fleck similarly fails to create a genuine dispute that the OIG report caused his non-selection for the Department of Defense position.  Fleck argues that the timing of his rejection from the position, coming just a day after his interview and only a few days after the OIG report's publication, allows the reasonable inference that the report played a role in his non-selection.  Undisputed evidence in the record, however, establishes otherwise.  With its motion, Defendant includes a declaration from Paul Koffsky, one of the two officials involved in the hiring process for the Department of Defense position.  Dkt. 49-4 (Koffsky Decl.).  In his declaration, Koffsky explains that both he and the other hiring official "agreed" that the individual who was ultimately selected for the position was "the best qualified candidate;" details the reasons why they reached that conclusion; states that he "did not consider Mr. Fleck's qualifications [to be] comparable" to that individual's; and attests that he has "no recollection of being aware at the time that Mr. Fleck was the subject of an [OIG] investigation or that an OIG report had been issued regarding him, nor . . . of that being a topic" in conversations about Fleck's candidacy.  Dkt. 49-4 at 1–2 (Koffsky Decl. ¶¶ 4–6).  Because Fleck offers no evidence to rebut these statements—including undisputed evidence that Fleck was not the best qualified candidate—he cannot establish that the OIG report caused his non-selection, and therefore that claim fails.

Fleck also does not proffer sufficient evidence to sustain his claim that a disclosure of the initial draft of the OIG report caused him to be denied a promotion to OGC Deputy General Counsel in November 2017.  This claim fails for a simple reason: Fleck offers no evidence that Defendant had disclosed any of the findings or results of the draft OIG report to one of the decisionmakers by the time his non-selection decision was made.  Fleck points to the fact that OIG's draft report was completed on November 17, 2017—the same day that General Counsel

Byrne announced that Mitrano had been selected for the position—as evidence that Bryne and the members of the interview panel *might* have seen a copy of the draft report. Dkt. 53-1 at 29–30 (Pl. SMF ¶ 135–36). That assertion, however, is purely speculative and, moreover, is undermined by Fleck's own testimony that he was told on November 15 or 16 that he would not be selected for the position. Dkt. 49-9 at 43 (Fleck Dep. at 98).

Fleck also indicates that certain members of the interview panel knew or may have known about the *existence* of the OIG *investigation* at the time of his interview—either because they had been interviewed by investigators or because they had learned about it in the regular course of their duties at OGC. Dkt. 56 at 35; Dkt. 49-7 at 3 (Hogan Aff. ¶ 9); Dkt. 56-1 at 29–30 (Pl. Sealed SMF ¶ 136). Mere knowledge of an ongoing investigation, however, is not a Privacy Act violation. Rather, Fleck must produce evidence that an inaccurate or incomplete *record*— that is, the draft OIG report—was disclosed to members of his hiring panel prior to November 17, 2017, and that the disclosure of that flawed record caused his non-selection for the Deputy General Counsel position. *Thompson*, 400 F. Supp. 2d at 19. On this score, Fleck falls short. Fleck also maintains that two hearsay statements that Bryne and Meghan Flanz made months after the non-selection decision suggest that they knew about the report's findings before the report was published. Dkt. 56 at 34–35. But those statements do not establish that Defendant disclosed a draft report, or even any of the report's findings, to Byrne or Flanz prematurely in November 2017. Fleck's assertion that Bryne and Flanz received a premature disclosure of the report is pure speculation. In any event, Defendant also produces unrebutted declarations by two of the members of the interview panel—Flanz and Michael Hogan—that detail why Mitrano was the best qualified candidate for the position and explain that Fleck was not considered one the top candidates for the position based purely on his responses to the interview questions and his

prior job experience.  Dkt. 49-6 at 2–3 (Flanz Decl. ¶¶ 6–9); Dkt. 49-7 at 2–3 (Hogan Decl. ¶¶ 6–9).  Fleck does not proffer any evidence to the contrary, nor does he assert that he was a better-qualified candidate than Mitrano.[6]

Fleck has also failed to proffer sufficient evidence to permit a reasonable jury to find a causal link between any inaccuracies in the OIG report and the legal fees he incurred to defend against whistleblower allegations that Fleck improperly hired three former colleagues from the Department of the Army into VA positions.  In support of his theory of causation, Fleck explains that the whistleblower submitted a court filing in separate litigation she has with Fleck in which she allegedly cites the OIG report "as support for her claim that . . . Fleck had improperly hired these three individuals."  Dkt. 56-1 at 31–32 (Pl. Sealed SMF ¶ 149).  Fleck explains, however, that he has not filed a copy of that court filing in this case—even under seal—"out of an abundance of caution given the whistleblower complaint."  *Id.*  Unfortunately, Fleck's failure to provide any record evidence to support his theory means that, as things stand, there is no genuine dispute of material fact with respect to the OIG report's causal connection with the whistleblower complaint.  The Court must therefore grant Defendant's motion for summary judgment with respect to this claim.  If Fleck is able to submit evidence to the Court (even if under seal) that establishes causation in support of his whistleblower claim, however, he may promptly seek reconsideration on that ground.

The Court will also grant summary judgment to Defendant with respect to Fleck's allegation that his medical condition worsened due to the OIG report for two reasons.  First, Fleck does not explain how any of the deficiencies that he identifies in the report—as opposed to

---

[6] Because the Court concludes that Fleck has not adduced sufficient facts to support his claim arising out of his November 2017 non-promotion, the Court need not consider whether that claim is timely.  *See* Dkt. 49 at 50–53; Dkt. 53 at 46–50.

the OIG investigation and the release of the report more generally—caused any alleged

deterioration in his health.  Second, Fleck does not produce any expert medical opinion

testimony with respect to causation.  *See Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 73

(D.D.C. 2014).  Although Fleck offers testimony from his healthcare provider, Mary Elizabeth

Alder, a nurse practitioner, Alder concedes that she is not an expert, and Fleck has not proffered

her as one.  Dkt. 72 at 3–4 (Alder Dep. at 14–15).  Moreover, even if she were competent to offer

a medical opinion as to causation, Alder admits that she would not be able to do so in this case

because Fleck's medical records do not offer a pre-OIG report baseline that would allow for such

an analysis.  Dkt. 72 at 31–32 (Alder Dep. at 57, 62).  Since the absence of any medical expert

testimony would leave the trier of fact "to speculate as to [the] cause or causes" of the alleged

deterioration of Fleck's health, *Halcomb v. Woods*, 610 F. Supp. 2d 77, 86 (D.D.C. 2009), the

Court will grant Defendant's motion for summary judgment with respect to any adverse health

effects Fleck may have suffered.

That leaves Fleck's claim that deficiencies in the OIG report caused him to incur legal

fees to defend against his proposed demotion.  With respect to this claim, the Court concludes

that a genuine dispute of material fact exists as to whether any deficiencies in the OIG report

proximately caused Fleck actual damages, and thus the Court will deny Defendant's motion for

summary judgment.

Legal fees that a plaintiff incurs to protect against the effects of an agency's Privacy Act

violations are cognizable damages under Section 552a(g)(4).  *In re U.S. Off. of Personnel Mgmt.*

*Data Sec. Breach Litig.*, 928 F.3d 42, 62 (D.C. Cir. 2019).  Defendant nevertheless maintains

that the fees Fleck paid his lawyer to defend against his proposed demotion are not cognizable

here for three reasons:  First, Defendant claims that, because the Court has already held that a

"proposed demotion" is not an actionable adverse determination, it should follow that any legal fees arising from the proposed demotion should not be actionable. Dkt. 49 at 44. Second, Defendant contends that the proposed demotion is not attributable to any deficiency in the OIG report because Mitrano—the proposing official—based her proposal on an independent review of the investigative file and on aspects of Fleck's conduct that are not in dispute. Dkt. 58 at 23– 25. And, third, it argues that Mitrano's proposal was an independent decision by a third-party actor that breaks the chain of causation. Dkt. 58 at 25. None of these arguments is persuasive.

First, Defendant misreads the Court's previous opinion in this case. There, the Court held only that a proposed demotion could not qualify as an *adverse determination* for the purposes of Section 552a(g)(1)(C). Dkt. 21 at 12–13. It did not conclude, however, that a proposed demotion or, for that matter, any efforts undertaken to challenge a proposed demotion could not qualify as adverse *effects* for the purposes of Section 552a(g)(1)(D), and Defendant has not pointed the Court to any support for such a rule. The Supreme Court, moreover, has interpreted Section 552a(g)(1)(D)'s reference to "adverse effect" as "a term of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing, and who may consequently bring a civil action without suffering dismissal for want of standing to sue." *Doe v. Chao*, 540 U.S. 614, 624 (2004). Because the efforts Fleck undertook to respond to the proposed demotion—including paying and retaining counsel—constitute a sufficient injury for the purposes of Article III standing, this argument fails, and, indeed, Defendant abandons it in its reply brief.

With respect to Defendant's second argument, the Court concludes that a genuine dispute of material fact exists as to whether the proposed demotion is traceable to any alleged deficiencies in OIG's report. Although Mitrano's letter proposing Fleck's demotion does not cite

to any specific findings in the OIG report, a reasonable juror could infer that Mitrano reviewed the report in addition to the investigative file and that the findings in the report likely influenced her proposal. Fleck's theory, moreover, is that the report violated the Privacy Act because it did not cite to evidence that significantly lessened his culpability. Those omissions are significant because Defendant only sent VA officials copies of the evidence and interview transcripts that it cited in its report. Thus, even if Mitrano solely reviewed the investigative file and reached her own judgments, she did not receive Diliberto's interview transcript or any testimony from Buonocore, whom VA OIG did not interview. Nor is Defendant's argument that Mitrano would have proposed a demotion anyway availing. The fact that, after receiving Buonocore's and Diliberto's testimony, General Counsel Byrne declined to issue Mitrano's proposed demotion and that VA Deputy Secretary Bowman rescinded his concurrence at least creates a dispute of material fact as to whether Mitrano might not have proposed a demotion in the first place.

Finally, VA OIG's argument that Mitrano's independent decision breaks the chain of causation misses the mark. Although independent action by a third party can sometimes negate the proximate causality of a defendant's actions, that is true only when the third party's action is unforeseeable to the defendant. *See Coombs v. Islamic Republic of Iran*, No. 19-3363, 2022 WL 715189, at *19 (D.D.C. March 10, 2022). Here, Mitrano's proposed demotion was certainly foreseeable to Defendant, if for no other reason than the fact that the OIG report itself recommends that the OGC management confer about the appropriate administrative action to take against Fleck. Dkt. 49-3 at 21.

In sum, because Fleck has adduced sufficient evidence to permit a reasonable trier of fact to conclude that a violation of Section 552a(e)(6) caused him to incur legal fees to challenge his

proposed demotion, the Court will deny Defendant's motion for summary judgment with respect to that claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 49, is hereby **GRANTED** in part and **DENIED** in part, and Plaintiff's motion to strike and for sanctions, Dkt. 52, is **DENIED**.

**SO ORDERED**.


 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  April 19, 2022